### Noel and Wife *v.* Ewing and Others.

Section 44, of the act of *May* 14, 1852 (1 R. S. c. 27), regulating descents and the apportionment of estates, provided that the act should take effect *August* 1, 1852; but as it contained no emergency clause, and was not published at that time, it did not take effect until *May* 6, 1853.

Section 16 of that act does not operate upon dower consummate, but simply substitutes a third in fee for dower inchoate, except where the rights of creditors intervene.

The law in force at the dissolution of a marriage by death, is the measure of the rights of the survivor.

Thus, where the husband died since *May* 6, 1853, the widow—no rights of creditors intervening—takes one-third of his real estate in fee.

The statute is not retrospective—death being the future event upon the occur-

rence of which it takes effect; nor does it impair the obligation of contracts.

Marriage is not simply a contract, but a public institution, not reserved by any constitutional provision, from legislative control; and all rights in property, growing out of the marriage relation, are alike subject to regulation by the legislative power.

Thus, the legislature is competent to increase or diminish dower, or to substitute a larger estate for it, or even to abolish dower inchoate altogether.

So, also, the legislature could, under the old constitution, grant divorces by direct enactment, and may under the new constitution, by general enactment, provide regulations by which the Courts may decree them, independent of the rules governing the rescission of contracts, and without regard to inchoate rights.

It was not dower, but the purpose of dower—namely, the support of the widow—which the law favored; and the statute having substituted a third in fee for dower, the substitute must be regarded with the same favor by the Courts.

APPEAL from the *Allen* Court of Common Pleas.

STUART, J.—This cause is brought here on a reserved question. The record is made up under the 347th section of the practice act. 2 R. S. p. 116.

That question is, whether, under the act regulating descents, and the apportionment of estates, approved *May* 14, 1852, the widow of *W. G. Ewing* is entitled to one-third of her husband's real estate in fee?

The facts and dates out of which this question arises, are briefly these:

*William G.* and *Esther Ewing* were married in *Detroit, Michigan,* in 1826. From their marriage till 1854, they resided in *Fort Wayne.* In the meantime, Mr. *Ewing* accumulated a large landed estate. In contemplation of a journey, he made his will, dated *August,* 1849, disposing of all his property. Among other things, testamentary provision was made for the widow, in lieu of dower.

The particular land in controversy was purchased in 1830. He died *July,* 1854, without children or the descendants of children. The will of 1849, was admitted to probate *August* 10th, 1854. In *January,* 1855, Mrs. *Ewing* filed her renunciation under the will, and her election to take under the statute. 1 R. S. p. 250, ss. 17, 27, 35.

Mrs. *Ewing* claims that, by the law in force at her husband's death, she is entitled to one-third of his real estate

in fee.   The devisees insist that she is entitled only to the dower allowed by the statute in force at the time the property was acquired; and that it was not competent for the legislature to substitute a fee of one-third, instead of dower, in any case where the marriage and seizin transpired prior to the taking effect of the new law.   In brief, the contest is this: Where the law of the marriage or seizin and the law of the husband's death conflict, which shall govern?

The Court below decided that Mrs. *Ewing* was entitled to one-third in fee.   The devisees appeal.

To elucidate the question, it will be proper to inquire—

1. What has the legislature enacted in the premises? and—

2. Was it competent for the legislature to so enact?

Many other points, intimately connected with the main question, will be noticed, incidentally, as they arise.

1. What has been enacted?   The provisions of the law will be found in 1 R. S. p. 250.   The first fourteen sections regulate descent under various contingencies.   The fifteenth section provides that every rule of descent and distribution shall be subordinate to the provisions made in behalf of the surviving husband or wife.

The sixteenth section is thus expressed: "Tenancies by curtesy and in dower are hereby abolished."

By the seventeenth section, "If a husband die, testate or intestate, leaving a widow, one-third of his real estate shall descend to her in fee simple, free from all demands of creditors."

The rights of the widow are further extended by the twenty-seventh section, to all the lands of which the husband was seized at any time during the coverture, and in the conveyance of which she may not have joined.

These several sections are to be taken together, and in connection with the saving clause of the repealing act, are to be construed as one entire provision.

The act itself provided that it should take effect on the first day of *August*, 1852.   1 R. S. p. 255.   But as it was not published on that day, agreeably to the constitution (art. 4, s. 28), and no emergency was declared (7 Ind. R. 13), it

did not take effect till *May* 6, 1853. From that day the new act speaks.

Dower at common law was in substance our own, and the only species to which we need allude. Its object was the maintenance of the widow, and the nurture and education of the children. Co. Lit. 30, b.—1 Cruise, tit. Dower, s. 6.—2 Black. Com. 130.—1 Toml. L. D. 587.—6 Ind. R. 20. Upon the marriage and seizin, dower was said to be inchoate; on the death of the husband, consummate.

Keeping the purpose of dower in view, let us resume the inquiry—What has been enacted?

Primarily, the act itself is its own best interpreter. The best evidence of what the lawgivers intended, is what they have said. The language of the sixteenth section is not that of a legal expert, nor is it remarkably perspicuous. Indeed, it may be doubted whether the Courts can give it any meaning or effect; for tenancies in dower, which it assumes to abolish, can only exist where the dower has become consummate, and is assigned. While inchoate, it is a mere claim—a contingent expectancy. *Lawrence* v. *Miller*, 2 Comst. 245.—11 Ill. R. 384. Even when consummate by the death of the husband, she is still not a tenant in dower till assignment. She has no right of entry; for, until assigned, she may not know on what particular land to enter. The sixteenth section assumes that dower consummate actually assigned, and the widow in possession, should be and is abolished.

But Courts will not presume that the legislature intended such an absurdity. When the context and the repealing act are considered, the purpose of the legislature is greatly relieved from obscurity. This mode of construction is in accordance with the statutory rule. 2 R. S. p. 329. The intention seems to be to leave dower consummate untouched, and instead of dower inchoate, to substitute a third in fee, where it can be done consistently with the rights of third parties. 1 R. S. p. 250. Thus, the law for the assignment of dower shall continue in force, &c. 1 R. S. p. 431. The significant word *assignment*, is the key to

the intent. When dower becomes consummate, it only remains to be assigned. For the benefit of those widows whose dower had become vested—consummate by the death of the husband, but not assigned—was the old law kept alive. Thus is full effect given to the substantial provisions of both acts, so far as applicable to this case.

That the law was intended to operate upon existing marriages, there can be no doubt. The first fourteen sections make death the contingency upon which the act is to apply. The subsequent provisions relate to the surviving widow or widower. Here, also, death is the future contingency. The seventeenth, eighteenth, and twentieth sections each begin—"If a husband die testate or intestate," &c. So the twenty-third, twenty-fourth and twenty-fifth sections —"If a husband or wife die," &c. What is intended? Does it mean only such as become husbands after the law takes effect? Or does it include all husbands, then existing or to become such thereafter? Clearly the latter. All who are husbands at their death, without regard to the date of the marriage, are included. Husbands, as a class, are embraced in the language used. So with the wife. It includes, in brief, all those who sustained the relation of husband or wife on the 6th of ·May, 1853, or might sustain that relation in future. Upon the dissolution of the marriage by death, the law applies.

In vindication of the statute, it should be observed that if she has the third of his real estate at his death, he has the same share of her realty at her death. Thus, the rights which by that event are perfected to the survivor, are equal.

Had it been intended to except persons married before the law took effect, that intention could have been easily expressed. That such exception was not made, leaves the strongest presumption that it was not intended. Dwar. on Stat. 717.

It is, therefore, clear, that the legislature intended the statute to operate on marriages existing when the law took effect.

It is equally clear that the law is not retrospective. It

establishes the death of one of the parties as the future event on which it is to operate. The relations and rights which had been determined by death prior to *May* 6, 1853, are not disturbed. They are expressly saved, and provision made to have them perfected. 1 R. S. p. 431, s. 4. It simply determines the legal effect of death, as a future event, on the rights of the survivor.

In the exposition of these several acts, we can attach no importance to the term, *vested,* as found in some of the reports. It is confessedly used improperly by one of the judges in 2 Johns. Ch. 29, and 2 Comst. 245, in opposition to other members of the bench. ´ We must presume in favor of the legislature that, if they consulted books at all, they were better acquainted with the definitions of *Blackstone,* than with the inaccuracies of state judges. Any other view of it, would greatly embarrass the Court and the legislature, and contravene the statute. 2 R. S. p. 339.

In the repealing act, the words limit the vested rights of dower to such as can be assigned. The wife cannot demand an assignment of dower inchoate. The widow can, of dower consummate. Dower inchoate does not import a vested estate; dower consummate does. For some purposes—for instance, as against the husband, his creditors, or vendees—the inchoate rights of the wife have always been protected. The husband cannot dispose of her inchoate dower; nor can his creditors subject it to·execution. But it is not protected as a vested right against the operation of a general law providing a substitute—a point to be presently examined.

It is not necessary, in this connection, to say what the sixteenth section abolishes, or whether it abolishes anything. All consideration of creditors and purchasers, prior to *May* 6, 1853, is also left out; because no such disturbing element enters into the case at bar. We have nothing to do with collateral questions and fancied consequences not legitimately in the record. It is not worth while to anticipate issues. The Court will thus be able to meet, untrammeled, every question as it arises.

That the statute under consideration is a correct reflex

of the popular will, must now be conceded; for three suc-
cessive legislatures, since that at which it was enacted,
have convened and adjourned, without repeal or material
modification.    We may, therefore, accept it as bearing the
impress of public approval—a measure of permanent state
policy—provided it was competent for the legislature to
substitute an estate in fee for dower.

May Term,
1857.

NOEL
v.
EWING.

2. We proceed, then, in the second place, to the question
of power.    Was it competent for the legislature to change
the relative rights of husband and wife after marriage?

It will be perceived that Mrs. *Ewing* is not complaining
that dower, under the law of the marriage, has been wrong-
fully abolished.    She does not call in question the power
of the legislature in that behalf.    But yet that power over
dower is incidentally involved.    The whole legislative ac-
tion is more or less under review.   It all comes to this:
Was it competent for the legislature to substitute for dower
inchoate, another and larger estate to be carved out of that
of the husband at his death?

Dower was a provision for the widow.    Cruise, *supra.*
Over property consecrated to such a purpose, it is not to
be presumed that the legislature would assume any unwar-
ranted control.    It is due from the judiciary to sustain and
reconcile their enactments, if possible.    We will not lightly
conclude that the law-making power has either ignorantly
or wilfully violated the constitution.    To justify the Courts
in declaring an act void, it must be clearly subversive of
that instrument.    6 Cranch, 87.—4 Wheat. 538.—1 Kent,
448.—4 Ind. R. 342.—5 *id.* 557.—6 *id.* 83.—*Id.* on p.
527.    They who claim that the legislature has, in this par-
ticular, transcended its constitutional power, should be
prepared to make a strong and a clear case.    All doubts
must fall in favor of the validity of the law.

In support of the power, there is a long array of legisla-
tive facts and history.    In this and other states, the legis-
lature has repeatedly changed the quantity of dower.    At
common law the widow was not endowed of equitable
estates.    As early as 1824—perhaps earlier—the widow
was endowed of all the lands, both legal and equitable,

May Term,
1857.

NOEL
v.
EWING.

of which the husband was seized during the coverture, whether he died testate or otherwise. R. S. 1824, p. 157, s. 1. So, also, R. S. 1831, p. 209, s. 12. Thus was dower enlarged.

In the school law of 1829, it was, as to mortgages to the school fund, abridged. Laws of 1829, p. 127.

In *February*, 1833, the same portion of the real and personal estate was secured to the widows of testates, as is by the act of 1831 secured to the widows of intestates (Laws of 1831, p. 46)—greatly enlarging the widow's rights on the very principles of the law of 1852.

The statute of 1838 made another change, abridging dower—limiting it, in equitable estates, to those held by the husband at his death, and in proportion to the purchase-money paid. R. S. 1838, pp. 238, 239. Thus was the dower abridged, and the estate enlarged.

By the act of 1842, the widow of an alien was entitled to dower. The act was made retrospective—going back to the very origin of the state government—not saving even the rights of creditors. Laws of 1842, p. 71.

The legislature of 1843 made still further inroads on the real and personal property of the estate, in favor of the widow—conferring various rights to which she was not entitled at common law. Laws of 1843, p. 67.—R. S. 1843, pp. 428, 429.

In all these instances, the law was taken to include existing as well as future marriages. Thus frequently did the legislature assume to enlarge or abridge the dower rights of the widow, at discretion. No one questioned its competency to do so. It is believed there is no instance in our Reports where the widow complained that these acts abridged her rights—though several of them had that effect. Nor is there any corresponding case, where the husband or his heirs complained of the statutes which enlarged the widow's rights, at the expense of their own.

Now, it is not to be disputed that every enlargement of the widow's dower was, precisely as is argued at bar, an encroachment on the rights of the husband. Every such enlargement was, *quoad hoc*, an incumbrance while he

lived, and remained so in the hands of his heirs, devisees, and vendees. Neither his deed nor devise could remove that incumbrance. How, then, can these changes be distinguished in principle from that at bar? In kind, they are precisely the same, and differ only in degree. In the numerous changes just alluded to, sometimes against the widow, sometimes in her favor, is it not remarkable that neither the bench, nor the bar, nor the people, dreamed that the legislature was transcending its powers? No one thought of going back a quarter of a century to find when this piece of property or that was acquired, or what were the rights of the widow under the law then in force, with a view to arrest the additional allowance made to her out of her husband's estate. All conceded the competence of the legislature to enlarge her rights, and acquiesced in its exercise. Indeed, the exigencies of a new country, where equitable titles and wild lands abounded, made these changes not only a salutary, but a necessary policy, to furnish adequate support for the widow. The only failing was, they did not go far enough.

The plain and intelligible theory upon which all these changes in the statutes were made and administered was, that the law in force at the death of the husband, when the inchoate claims of the wife became consummate, was the measure of her rights. *Ostrander* v. *Spickard*, 8 Blackf. 227.—*Matlock* v. *Matlock*, 5 Ind. R. 403.—*Whitsell* v. *Mills*, 6 Ind. R. 229.—*Hendrickson* v. *Hendrickson*, 7 Ind. R. 13. And this is the well settled rule. *Kennerly* v. *Missouri Insurance Co.* 11 Mo. R. 204.—*De Peyster* v. *Clendining*, 8 Paige, 295. In these states, dower has always been treated as the creature of the statute—abridged or enlarged at pleasure.

A further induction, strongly corroborating the views just expressed, is to be found in the action of the constitutional convention. That body placed upon the law-making power many wholesome restrictions. Here the subjects, there the mode of legislation, were restrained. Yet while, as we have seen, the legislature had, from the first, assumed the power to mold the relative rights of husband

and wife as it pleased, the constitutional convention placed but one check on the assembly in that behalf. It prohibited the granting of divorces by special act. Art. 4, s. 22. This is the only restriction. In every other respect, the convention left the whole subject of marital rights where it found them—in the discretion of the legislature. Thus was tacitly sanctioned the power which, for a period of thirty-four years, the General Assembly had assumed and exercised, namely, to change at pleasure, and simply as a measure of public policy, the relative rights of husband and wife—enlarging the one at the expense of the other. 5 Blackf. 384.

So established and so sanctioned, the exercise of such power is matter of legislative discretion, which the Courts cannot rightfully control. *Bebee* v. *The State*, 6 Ind. R. 501, *et infra*. If, therefore, the legislature of 1851–2 thought it expedient to change dower, and, in lieu thereof, carve a new and enlarged estate for the widow out of that of her late husband, they assumed nothing, either of power or of principle, which had not been repeatedly assumed, in a greater or less degree, during the previous thirty-five years. The exercise of such a power for so long a period, with the sanction of the people and the Courts, and unrestrained by the constitutional convention, can now be arrested only by an amendment to the fundamental law.

It follows, as a necessary sequence, that if the legislature could enlarge dower in one direction, they could in another. If they could attach dower to equitable estates, they could increase it in legal estates.

So of abridging dower. If the legislature could decrease the subjects to which dower should attach, they could diminish the quantity. Instead of a third, they could make it a sixth for life. Nay, upon the same principle they could abolish dower inchoate altogether.

Or they might, as they have done, substitute some other estate. For it is too plain for argument, that, if the legislature could increase dower to the actual value of one-third in fee, by making it two-thirds or three-fourths for life, they could substitute the third in fee directly.

May Term,
1857.

NOEL
v.
EWING.

Thus, a statute which changed joint tenancies into tenancies in common, and was extended to past grants and devises, was held not to be retrospective in the sense of affecting vested rights. For the death of one of the joint tenants had not yet perfected the rights of the survivor. That the deed had already created a joint tenancy, was no objection; because it was in legal effect the same as if it had provided that upon the future decease of a joint tenant, the principle of survivorship should not operate. And this decision was repeatedly reviewed and adhered to by the Court that made it. *Holbrook* v. *Finny*, 4 Mass. R. 566.—*Miller* v. *Miller*, 16 Mass. R. 59.—*Burghardt* v. *Turner*, 12 Pick. 534.

When to this authority, so directly in point in several particulars, the peculiarity of marriage as an institution (to be further noticed hereafter) is added, it carries conclusive weight in favor of the power of the legislature.

Nor is there, in the case at bar, any controlling equity against the widow. Mr. *Ewing* died without children or the descendants of children. His immense wealth goes by his will mostly to his kindred. Two-thirds of it must, at all events, go that way, whatever the Courts may decide as to the law of 1852. The controversy in the case at bar is between these collateral kindred, on the one side, and the widow of Mr. *Ewing* on the other, as to the remaining third. She has all the equity. She was the sharer of his toils for a period of twenty-eight years, while his great wealth was acquired. Were equity strictly meted out to the parties, her share would be far more than she here claims.

As a dowress, under the former system, she was a favorite of the law—her right superior to that of creditors. 1 Story, Eq. Jurisp. 583.—3 Brown's Ch. 264.—*Kennedy* v. *Nedron*, 1 Dall. 417. *Coke* quaintly says, "there be three things highly favored in law—life, liberty, and dower." Co. Lit. 124, b. In 1 Dall. *supra*, it is thus expressed: "Dower is a legal, equitable, and moral right, favored in a high degree by the law, and next to life and liberty held sacred." The widow's dower was recognized in *Magna*

*Charta,* s. 8. In the celebrated ordinance of 1787, for the government of the *North-West* territory, the right of dower is expressly secured, until altered by future legislation. 1 R. S. p. 77.—*May* v. *Rumney,* 1 Manning, 1.—*Botts* v. *Wise,* 11 Ohio R. 219.

In modern authorities, the same doctrine is thus stated: The husband is bound by the law of God and man to provide for his wife; and the obligation to provide that after his death and during her natural life, she be suitably supported, is equally binding. 1 Cruise, tit. Dower, s. 6. It is the legal, as well as the moral right of the widow, to derive her support for life out of the husband's estate. 1 Story, Eq. Jurisp. 582.

In this doctrine, running through a period of several hundred years, and asserting a principle so congenial to natural equity, it is not dower itself which the law holds sacred. It is the purpose for which dower was reserved— it is the support of the widow out of the wealth she has helped to acquire, which the law favors. No matter what the name—whether dower or some other estate—they are all the same. The support of the widow is the end to be attained. The law of 1852 substituted a third in fee in lieu of a third for life. The Courts must regard the substitute with the same favor, and administer it with the same liberality, extended to dower; and for the same reason—that the widow is a favorite of the law.

We have carefully examined the cases of *Moreau* v. *Detchemendy,* 18 Mo. R. 522; *Lawrence* v. *Miller,* 2 Comst. 245; *Westervelt* v. *Gregg,* 2 Kernan, 202; and others relied upon by counsel for the devisees.

In the *Missouri* case, there was an ante-nuptial contract, and the decision is expressly put upon that ground. It has, therefore, no application to this case. The case in 2 Comst. bears strongly against the devisees.

To analyze these decisions separately would expand the opinion to an unreasonable length. Without stopping to note the marked distinctions between those cases and that at bar, it is obvious that some of them proceed upon a misconception of the marriage relation. It is treated as

an ordinary contract between citizens, and the rules applicable in such cases sternly applied.

For instance, in the *Westervelt* case, the true relation of marriage as an institution of public concernment, and under the public control, is overlooked. Whether that decision be right or wrong, as a construction of the *New York* statutes, we do not pretend to inquire. We allude only to the general principles upon which the Court in part proceeds. That Court overlooks the distinctive characteristics of marriage. In neither of the opinions is it recognized that the marriage relation is to be distinguished from any other contract. Like other contracts, it is assumed that the law of the marriage enters into and forms a part of it. Here is the latent unsoundness of the *Westervelt* case, so far as it proceeds upon general principles. It is aptly illustrated in Bishop on Marriage, &c., and other text-books, by the case of a husband who claimed the right to chastise his wife with a rod the thickness of the judge's finger, because such was the law of *England*, when the marriage was celebrated.

The authorities showing the unsoundness of this position will be presently noticed.

As between marriage and other contracts, the distinction in part seems to be this: that marriage is not technically a contract within the protection of the constitution of the *United States;* because, in the language of MARSHALL, C. J., "that clause was never understood to embrace other contracts than those which respect property." 4 Wheat. 500. Property is not primarily or solely the object of marriage. It is but an incident that may or may not attach.

Some confusion has arisen from confounding the contract to marry with the marriage relation itself. And still more is engendered by regarding husband and wife as strictly parties to a subsisting contract. At common law, marriage as a *status* had few elements of contract about it. For instance, no other contract merged the legal existence of the parties into one. Other distinctive elements will readily suggest themselves, which rob it of most of its

May Term,
1857.

NOEL
v.
EWING.

characteristics as a contract, and leave it simply as a *status* or institution. As such, it is not so much the result of private agreement, as of public ordination. In every enlightened government, it is pre-eminently the basis of civil institutions, and thus an object of the deepest public concern.

In this light, marriage is more than a contract. It is not a mere matter of pecuniary consideration. It is a great public institution, giving character to our whole civil polity. Hence, as between husband and wife, there is no constitutional provision protecting the marriage itself, or the property incident to it, from legislative control, by general law, upon such terms as public policy may dictate. The sovereign power may, by general enactment, regulate and mold their relative rights and duties at pleasure. And the statute in force at the dissolution of the marriage by death, is the measure of the survivor's rights. The same is true of divorce—the existing statute governs.

In support of this position are several recent and controlling authorities. *Melizet's* appeal, 17 Penn. R. 449.— *Maguire* v. *Maguire*, 7 Dana, 181.—*Dickson* v. *Dickson*, 1 Yerg. 110.—Bishop on Mar. and Div. b. 2, c. 3, and the authorities cited.

In *Melizet's* appeal, the Supreme Court of *Pennsylvania* say: "It was vehemently contended at bar that the act of 1848, to secure the rights of married women, was unconstitutional, because it impaired the vested rights of the husband. Here in this commonwealth, laws have been passed, from time to time, altering the statute of distribution, and altering the manner of making wills. These laws have been considered sound and good, if in operation at the time of the decedent's death—no matter whose inchoate interests they affected. The legislature might, in their discretion, annul the common-law right of dower and repeal the statute of wills. There is no constitutional provision protecting dower. It is not part of the marriage contract. It results from wedlock by the operation of laws existing at the time of the husband's death."

The Court conclude that the act of 1848 is constitu-

tional, as applied to marriages contracted *before* its pas-
sage, where the death of the husband is subsequent.

So in 7 Dana, *supra*—marriage, say the Court, "depend-
ent essentially on the sovereign will, is not embraced in
the constitutional interdict on legislative acts impairing
the obligation of contracts. The obligation is created by
the public law, and subject to the public will. Such power
is inherent in every independent nation."

So in 1 Yerg. *supra*, the Court say marriage is an in-
stitution so different from ordinary contracts, that society
has even more interest in it than the parties themselves.

That there should be conflicting authorities and dicta,
was to be expected. Few great questions have ever been
settled with entire unanimity of Courts and judges. Amid
such diversity, each Court must determine for itself the
better reason. And while Courts are debating, and judges
hesitating, time often settles the question practically, leav-
ing the judiciary no option but to approve what has been
done, or to unsettle all the relations of society, to realize
an abstraction.

Such we apprehend has been the course of events, on
the main question in the present case. Aside from many
obvious peculiarities incident to the marriage relation, the
practice of the country has determined that marriage, as a
contract, is not within the protection of the *United States*
constitution.

The first time this point appears to have been mooted,
was in the argument of the *Dartmouth College* case. In
reply to that argument, the Chief Justice made the obser-
vation already quoted. But in the same case Judge *Story*
took a different view—saying, however, in conclusion, "I
leave this question to be settled when it shall arise." 4
Wheat. 577. So that the point was not before the Court;
and what was said by the judges, *pro* and *con*, was con-
fessedly *dicta*.

This was in 1819. But in his Conflict of Laws, writ-
ten many years after, Judge *Story* virtually admits the
right of the legislature to grant divorces. Conf. of Laws,
s. 201, *et infra*. So in his Commentaries on the Consti-

May Term,  tution, also prepared long afterwards, he guardedly says
1857.      that the power has been denied in argument.   3 Com. on
NOEL       Const. s. 1391.   Had he been clear against the power, he
v.         could scarcely have failed to discuss the question in one
EWING.     or other of these elaborate works.   Especially would such
a discussion have been appropriate in his Commentaries
on the Constitution.

His position in the *Dartmouth College* case must, there-
fore, be regarded as abandoned by himself.   For he neither
quotes it, nor further fortifies what he there said.   On the
contrary, in his Conflict of Laws, he admits that marriage
is an institution rather than a contract; and quotes with
approbation authorities wholly at variance with his own
former position.   Conf. of Laws, cc. 5, 6.

While *Story* and other judges were doubting, the Courts
of *Pennsylvania*, *Kentucky*, and *Tennessee* determined the
question, as has been seen, adversely to his first impressions.
Our own state accomplished the same end another way.
The numerous divorces granted by the legislature of *Indi-
ana*, before 1851—at one session thirty-eight—are so many
illustrations of the authorities cited.   And now, by stat-
ute, the judiciary have almost unlimited discretion, alike
over the marriage relation, and the property of the parties.
2 R. S. p. 234, s. 7.—*Id.* p. 237, ss. 18, 19, 20, *et infra.*   So
have the legislature, so long as the doctrine in *M'Intire* v.
*The State*, 5 Blackf. 384, stands as the rule of construc-
tion—save only as to granting divorces by special act.
Const. Art. 4, s. 22.

In the divorces alluded to, the legislature of *Indiana* cer-
tainly assumed the power to abolish marriage, and such
inchoate rights as were incident to it.   For there is no
provision made to save these imperfect rights to either
party.   It is well settled that a divorce, whether legisla-
tive or judicial, terminates such claims.   For to consum-
mate a claim of dower or of curtesy, the marriage must
exist at death.   4 Kent, 36.—*Reynolds* v. *Reynolds*, 24
Wend. 193.—*Whitsell* v. *Mills*, 6 Ind. R. 229.

The power to pass divorce laws, both general, to be ad-
ministered by the Courts, and special, granting divorces

in particular cases, has been assumed and exercised in a large majority of the states, where it is not prohibited by their own constitutions. In the year 1800, *Ohio* began with one legislative divorce. Up to 1845, over a hundred special divorce acts had been passed. In one year, (1845,) the legislature of *Pennsylvania* granted twenty divorces; and for ten years, up to 1856, inclusive, over eighty divorces. So far as we have examined these acts, they are like our own, brief, without preamble, or cause of divorce assigned, and without any saving of imperfect rights. In *Connecticut*, legislative divorces are held to be constitutional. *Starr* v. *Pease*, 8 Conn. R. 541. The state governments, says *Kent*, have complete control and discretion in divorce cases. 2 Kent, 107.

If marriage itself can be thus dissolved at the discretion of the sovereign power, whether by general or special statute matters not, surely the mere incident of marriage—property—is not higher or more sacred than the principal thing itself. The support of the wife is an incident of the marriage. The legislature can vary that at pleasure. It is even now daily enforced under various enactments. The support of the widow out of the estate of the husband is an incident of the same kind, established upon principles of natural justice, to which allusion has already been made.

Divorces are not governed by the rules which govern the rescission of other contracts. They are acts of sovereignty, dictated by considerations of public policy, on subjects entirely within state control and municipal regulation. It would be hazardous to now declare these acts unconstitutional. The practice has been too extensive and long continued; and on any but a clear question, the consequences would be too serious. The Courts will, therefore, wisely hold, as Courts have always conservatively held, that whatever might have been the construction, were it *res integra*, time, and the practice of the states, and the immense interests involved, in addition to the intrinsic character of the marriage relation itself, have settled the question of legislative power over it, beyond

the reach of judicial speculation. We are, therefore, of opinion that the act of 1852 is constitutional and valid. Being in force at the death of Mr. *Ewing*, it is the measure of the widow's rights. The judgment below, giving her one-third in fee, subject to the proviso of the seventeenth section, should be affirmed.

While hitherto opposing the law as a measure of policy, we have yet endeavored, throughout this investigation, to keep our steps *super antiquas vias*, under the guidance of principle and authority, to whatever conclusion these might lead.

PERKINS, J.—I have come to the conclusion that the judgment of the Court of Common Pleas in this case should be reversed.

I will, as briefly as possible, state the reasons upon which I have arrived at such result.

At the time of the marriage of the parties and the purchase of the property in question, the entire fee simple in real estate, purchased by the husband, became, by law, his—vested in him. He could convey it by deed while living, and by will at death, subject only to the wife's right of dower—a right to the use of one-third of it during such period of time as she might outlive her husband. By a law, passed after the marriage, and after the purchase of the property, the husband was deprived, if the law is to operate immediately, of the right of conveying, by deed or will, one-third of the fee simple of his property; and the existing dower right of the wife was enlarged to a contingent right, in fee simple, to one-third of such property.

The law is as follows:

Tenancies by the curtesy and in dower, are hereby abolished.

A surviving wife is entitled to one-third, in fee simple, of all the real estate of which her husband may have been seized in fee simple, at any time during the marriage, in the conveyance of which she may not have joined.

The law providing for the assignment of dower shall

continue in force, so far as rights of dower vested under existing laws are concerned.

This is all of the statute, somewhat summarily, and not literally stated, which is necessary to the understanding of the case. The provisions must be considered together, and the question is, as to the time of operation, how is the statute to be construed? Is it to operate prospectively or immediately; upon future or existing cases?

I hold that it is to be construed prospectively—

1. Because there is nothing in the language of the statute requiring it to be construed otherwise.

2. Because the two estates of dower right and fee simple right, are not intended to exist in the same person; and the statute, in continuing in force the law for the assignment of dower, by implication declares that existing vested rights of dower shall be continued, and hence, limits the fee simple right, which is to take the place of dower, to cases of future acquisition of property.

3. The statute does not define, in terms, what it means by a vested right of dower under existing laws, and that term is indifferently applied in law-books, to both inchoate and consummate rights of dower. It is admitted the statute must be construed prospectively as to the latter; but the statute must embrace inchoate rights of dower, also. This must be plain, or it will have to be admitted that in certain cases the statute has absolutely abolished inchoate rights of dower, and given the widow nothing instead. Suppose a marriage to have occurred, property to have been purchased, and to have been sold by the husband, the consideration to have been received, the wife not having joined in the conveyance,—prior to the statutes of 1852, above quoted,—and the husband to have died afterwards. In that land, at the passage of those statutes, there was but an inchoate right of dower. Now, if the statute abolishing dower operated on existing estates, and the statute continuing the law in force for the assignment of dower, did not and does not operate as to cases of inchoate rights then existing, the widow of the deceased husband, in the case put, can never obtain dower. Her right as to that is

gone, and she takes nothing, unless the law, as against a *bona fide* purchaser, takes from him one-third of his purchased and paid-for land, and transfers it to the widow of the deceased grantor. For this latter proposition, I take it, no one who holds that our constitution imposes any restraint on legislative power, will contend.

The statute, then, expressly saves inchoate rights of dower, as well as consummate; for how can it be said that it saves some inchoate rights of dower, and not all? that it uses the term vested as embracing inchoate rights in some cases, and not in others, when the statute makes no distinction? The statute must, therefore, by its very terms, be construed prospectively, as to all existing cases of inchoate and consummate dower; for it must be construed prospectively as to all cases in regard to which the proceeding for the assignment of dower is continued in force.

4. It has been decided by Judge McLEAN and Judge WILKINS, in separate opinions, that whether inchoate rights of dower are protected by the constitution or not, they are so far vested as to be embraced by a saving statutory provision like that above quoted, and to require a general provision in effect abolishing inchoate dower, to be construed prospectively. *Johnson* v. *Vandyke*, 6 McLean, 422, and cases cited. See, also, *Lawrence* v. *Miller*, 2 Comst. 245, and cases cited by SHANKLAND, Justice.

In this latter case, it was decided that the act there in question did not operate on the case then before the Court; and that was all that was decided. Two opinions were delivered, one by SHANKLAND, the other by GARDINER, both speaking for the Court, and themselves individually, and concurring in result. SHANKLAND closes: " My own opinion is, that the act is wholly prospective in its operation, and has no application to cases where the marriage and seizin of the husband both happened prior to its passage. But the majority of the Court place the decision of this case upon the ground that the dower had been assigned to Mrs. *Lawrence* previous to the surrogate's order of sale, and do not pass upon the constitutionality of the act."

As to the case of Mrs. *Lawrence*, the whole Court held

the act prospective, and hence did not decide whether, if it
had not been prospective, it would have been constitu-
tional. The difference in the Court was, whether they
should say the act was wholly prospective, or unconstitu-
tional, or prospective as to that case, leaving the other
question for future decision; and a majority preferred to
take the latter course.

5. The general rule of law governing the construction
of statutes is, that, where rights will be affected, or, in the
language of Justice BRONSON, a wrong will be done to any
one, by giving them an immediate operation, they must be
prospectively construed, even though the language em-
braces existing interests. *Sackett* v. *Andross*, 5 Hill, 327,
where the question is forcibly discussed, and the authorities
presented. Also, *The Aurora, &c. Co.* v. *Holthouse*, 7 Ind.
R. 59. We thus construe the new constitution. *Hand* v.
*Taylor*, 4 *id.* 409. Here, it requires an argument to jus-
tify an *in presenti* construction; but—

6. I hold that the act, applied to existing interests, would
be unconstitutional and void; and I am unable to perceive
that it is any the less so because the legislature may have
inadvertently enacted several, obnoxious to the same objec-
tion. See, especially, *Maize* v. *The State*, 4 Ind. R. 342.
In the language of Mr. Justice JOHNSON, in *Newell* v. *The
People*, (3 Selden, p. 94,) "although the action of the other
departments of the government is always entitled to the
respectful consideration of the judiciary, it can and ought
to weigh nothing when it conflicts with their settled con-
viction of the requirements of the constitution."

If the operation of the act is to transfer the property of
one person to another, it is unconstitutional. "The legis-
lature cannot take the property of *A.* and give it to *B.* So
in the school cases, it was said by this Court that the legis-
lature could not take the property from *A.* and *B.*, divert it
from their use, and distribute it ratably to third persons.
The unsoundness of such legislation, as violating funda-
mental principles, could not be doubted. 6 Ind. R. 83."—
*Beebe* v. *The State*, 6 Ind. R. on p. 524.

Is such the effect of the statute in question, if operative

upon existing estates? Take a case to illustrate. The day before the statute took effect, A., a married man, owned three acres of land. He could sell and convey by deed, or he could devise by will, the entire fee simple of the three acres. It was his property. The statute, on taking effect, divested him of the right to sell or devise the fee simple of one of those acres, for the purpose of giving it to another person, and on the day following, the husband dying, did give it to another. In effect, the statute transfers from the husband to the wife one-third of the fee in his real property, but subject to revert to him, should he survive her. This is substantially the transfer of the property of one person to another by the legislature. But it has been said that the husband and wife are two persons in one, and hence, that transferring property from one to the other of them, cannot be regarded in the light of an ordinary case of transferring it from one individual to another. The proposition is not true. However closely connected should be the union of husband and wife, (and it cannot be too close— the merger of the individual too complete,) still it must be conceded to be settled law, that as to rights of property, the husband and wife are regarded as two persons, having separate interests. *Wilkins et al.* v. *Miller*, at the present term. This is admitted equally by those who hold marriage a contract simply, and those who hold it a contract and *status* combined, and those who hold it a sacrament. *Bishop*, in his work on Marriage and Divorce, says, "there is a distinction between the marriage *status*, and those property rights which are attendant upon, and more or less closely connected with it." As to these, he says, when the parties fail to regulate them by contract, "the law furnishes the rule, and presumes they agreed to be governed by it." B. 2, c. 3, ss. 37, 38. And rights of property acquired by virtue of a statute, cannot be taken away by statute. *Terrett* v. *Taylor*, 9 Cranch, 43. It has been expressly decided by the Court of Appeals of *New York*, no one dissenting, that a law passed after marriage, depriving the husband of his common-law right to reduce his wife's choses in action to possession—thus leaving them the separate property of

the wife—was unconstitutional and void, because it de-
prived the husband, in favor of his wife, of a valuable
right. *Westervelt* v. *Gregg*, 2 Kernan, 202. Property has
always been held as a legitimate consideration to enter
into a marriage contract. *Bradish* v. *Gibbs*, 3 Johns. Ch.
523. The respective rights of property, then, in husband
and wife, are protected by the constitution, as are the
rights of property in other individuals.

But it is not necessary, to render the act unconstitu-
tional, that it should take the property from one and give
it to another. It is enough if it take the property from the
owner. The Chancellor of *New Jersey*, in *Glover* v. *Pow-
ell*, (3 Am. Law Reg. 367,) says, "A partial destruction
or a diminution in its value, is the taking of private pro-
perty." This is where, of course, it is the immediate effect
of the law to accomplish such result. Does the law in
question do that? Let a case illustrate. A man was the
owner of a farm the day before the law was enacted. He
could sell the fee simple of the whole of it, for a conside-
ration that that fee simple was worth. The day after the
law took effect, he found himself left with the power of
selling but two-thirds of that fee simple for a consideration
such two-thirds might be worth, the statute having forever
deprived him of the right of selling the other third. Did
it take from him no vested interest in property? Was it
not a partial taking, a diminution of its value? It, as to
him, forever deprived one-third of it of its vendible quality.
And, says HUBBARD, Justice, in *Wynehamer* v. *The People*,
(3 Kernan, p. 456,) "But the abolition of all right of sale
is equivalent to, and is, a substantial deprivation of the
owner of his property." So COMSTOCK, Justice, in the
same case (p. 396), "Nor can I find any definition of pro-
perty which does not include the power of disposition and
sale." See, also, the numerous authorities cited.

And, I repeat again, what I have already said, that the
law involved in this case was enacted for the express pur-
pose, if not prospective in operation, of affecting and
changing individual property rights. And the object, the
real purpose, for which a law was enacted, is a legitimate

May Term, 1857.

NOEL
v.
EWING.

matter to be looked at in determining upon its constitutionality. *Wilkinson* v. *Leland*, 2 Pet. 627.

To give a summary, then, of my views—

1. I hold the law should be prospectively construed, because, to give it operation upon immediate interests would work injustice, at all events, and, in my opinion, render it obnoxious to constitutional objections. And, if, to give it such prospective operation, would be attended with the difficulty and confusion indicated by SELDEN, Justice, as incident to such a construction of the liquor law of *New York*, it is probable that, as he held in regard to that law, it must be wholly void for that reason. See his opinion in *Wynehamer* v. *The People, supra.*

2. I admit that, as between the widow and the heirs, the legislature may increase the share to go to the former, out of property undisposed of by the husband. It is now settled that the heirs have no vested or natural right to the acquisitions of the parents, though it was once held differently. It has been held by this Court that a father may entirely disinherit his children. 5 Ind. R. 137.

3. Nor am I prepared to deny that the legislature may, for reasons of state, in times of public calamity, as a police regulation, suspend, for a longer or shorter period, the conveyance, by the owner, of his property. Circumstances might, perhaps, arise, in which the public welfare would demand as stringent a law as that—leaving, however, to the owner his right to convey when the restraint should be removed.

4. But in this case, no such public necessity occasioned the law. The object of the law, in prohibiting the conveyance of one-third of his real estate, by the husband, was to transfer, in a contingency, the fee simple of that portion to another person, perhaps to another family.

5. I hold, as a general proposition, that the right to transfer, to sell and convey, property, is an incident to—a part (if the expression may be used) of the right of property itself, and cannot be taken away by the legislative power of this state, with a view to the accomplishment of such purposes as the act under consideration contemplated.

See my views in *Beebe* v. *The State*, 6 Ind. R. 501; *White-neck* v. *The Madison and Indianapolis Railroad Co.*, 8 Ind. R. 217; and *Herman* v. *The State*, 4 Am. L. Reg. 344; S. C. 8 Ind. R. Append. See, also, 2 Kernan, 202; 3 *id.* 378; 18 Missouri R. 522; *The Junction Railroad Co.* v. *Harris*, *May* term, 1857, of this Court.

May Term, 1857.

NOEL
v.
EWING.

6. It seems, also, that the right to dispose of property by will, is now becoming to be regarded as a natural right, though *Blackstone* and *Paley* do not so admit it. And here we may remark, that the restriction upon the power of the husband to convey, imposed by the law in question, is not, as has been suggested, a mere regulation of the right, a mere requirement that the consent of the wife, like that of the president in case of *Indians*, should be obtained. The mere consent of the wife will not avail; the husband cannot convey a dower right even, of the wife, simply by her consent. She must make the relinquishment herself; and this, more than anything else, tends to show the actual attempted transfer, by the statute in question, of an interest in the property of the husband, from him to the wife. See *Johnson* v. *Vandyke*, 6 McLean, 422, 429.

"The supreme power does not, of itself, require that the prince should have this absolute dominion over the estates of his subjects. The property of individuals is prior to the formation of states, and there is no reason which can induce us to suppose that those individuals entirely transferred to the sovereign the right they had over their own estates; on the contrary, it is to secure a quiet and easy possession of their properties, that they have instituted government and sovereignty.

"Let us, therefore, conclude that, in general, the right of the prince over the goods of the subjects is not an absolute dominion over their properties, but a right founded on the nature and end of sovereignty, which invests him with the power of disposing of those estates in different manners, for the benefit of individuals, as well as of the state, without depriving the subjects of their right to their properties, except in cases where it is absolutely necessary for the public good." Burlamaqui, vol. 2, p. 144.

May Term,
1857.

NOEL
v.
EWING.

"From the power which a man has of alienating his property in what manner and upon what condition he pleases, it follows that he may naturally prevent his pro-. perty from ceasing upon his death, by making a will and disposing of it in his lifetime." Rutherforth, p. 47.

"Every man may naturally choose the person to whom he would leave his property after his death, as long as his right is not limited by some indispensable obligation—as, for instance, that of providing for the subsistence of his children." Vattel, 116.

"The power of alienation of property is a necessary incident to the right of property, and was dictated by mutual convenience and mutual wants. * * * * Grotius considers disposition by will to be one of the natural rights of alienation. * * * * In England, the right of alienation of land was long checked by the oppressive restraints of the feudal system, and the doctrine of entailments. All those embarrassments have been effectually removed in this country, and the right to acquire, to hold, to enjoy, to alien, to devise and to transmit property by inheritance, to one's descendants, in regular order and succession, is enjoyed in the fullness and perfection of the absolute right. Every individual has as much freedom in the acquisition, use, and disposition of his property, as is consistent with good order and the reciprocal rights of others." 2 Kent, pp. 326, 327.

See, also, Johnson v. Hubbell et al., 5 Am. L. Reg. 177, where it is decided by the Chancellor of New Jersey that "A person may make an agreement, which will bind him legally to make a particular disposition of his property by last will."

7. If, then, the doctrine be established, that the right to dispose of property by will is a natural right, incident to property, it follows that the right is protected by the constitution. See Beebe v. The State, 6 Ind. R. 501. And hence, the law under consideration is void, so far as it operates otherwise than prospectively, upon two grounds: 1. In prohibiting the owner, upon no considerations of public welfare, from selling and conveying his property during his

lifetime; 2. In depriving him of the power of disposing of it by will at his death; both these things being done for the purpose (which is accomplished on the death of the husband, living the wife,) of transferring the property, against the will of the owner, to another person, perhaps to another family.

8. In the view I have taken of the case, it has not been necessary to speak of the wife's contingent right of dower. Perhaps the legislature might change that, as against her. See *Lawrence* v. *Miller*, 1 Sandf. 516; S. C. 2 Comst. 245; *Lawrence* v. *Brown*, 1 Seld. 394. The question here is upon the right of the legislature to deprive the absolute owner of property of the right to dispose of it, no public necessity or interest intervening to be subserved.

It may properly be added, that the parliament of *England* made a law altering the respective rights of husband and wife in real estate, expressly prospective, operating only where the marriage was subsequent to the law. Will. on Real Property, p. 171.

*Per Curiam.*—The judgment is affirmed with costs.

*J. B. Howe, J. E. McDonald,* and *S. C. Wilson,* for the appellants.

*R. Brackenridge, H. P. Biddle,* and *J. Sullivan,* for the appellees.