The State vs. Duket.

## THE STATE vs. DUKET.

*April 8 — April 23, 1895.*

*Dissolution of marriage by life sentence: Constitutional law: Subsequent marriage: Validity: Reversal of sentence.*

1. Sec. 2355, R. S., providing that "when either party shall be sentenced to imprisonment for life, the marriage shall be thereby absolutely dissolved, without any judgment of divorce or other legal process, and no pardon granted to the party so sentenced shall restore such party to his or her conjugal rights," is a valid enactment, not in conflict with sec. 24, art. IV, Const., which provides that the legislature shall never grant any divorce.

2. Where a marriage had been so dissolved by sentence of the husband, the marriage of the wife to another person, pending a review of the case in the supreme court, was valid, and was not avoided by the subsequent reversal of the sentence for error and not for want of jurisdiction.

EXCEPTIONS from the circuit court for Ashland county: JOHN K. PARISH, Circuit Judge. *Exceptions sustained.*

This case comes before the court upon exceptions under

sec. 4720, R. S., from which it appears that the defendant was tried and convicted in the circuit court for Ashland county upon an information charging him with having on the 6th of May, 1893, at the county of Ashland, and thence continuously up to October 3, 1893, committed adultery with Lucy French, then and there the lawful wife of William G. French, who was then and there still alive, etc.

The case was submitted to the jury on a stipulation of facts, namely: That William G. French and Lucy M. French were married about the year 1875, and are both still living; that in June, 1891, William G. French was convicted of murder in the first degree, and sentenced to imprisonment for life, and said sentence was executed; that May 22, 1893, the supreme court of Wisconsin reversed such sentence and granted a new trial; that on May 6, 1893, said Lucy M. French and the defendant were married, and lived together as man and wife up to the time of his arrest for this offense; that before such marriage the defendant had been advised by counsel that the conviction and sentence of William G. French constituted a legal separation, without further judicial proceedings, entitling him to marry her without the intervention of a decree of divorce; that the marriage was consummated on said facts and advice, and had no reference to proceedings in the supreme court; that the defendant at the time of the marriage knew of the proceedings then pending in such court for a new trial; and that, after the reversal of the sentence, defendant was advised by counsel that such reversal did not restore William G. French and Lucy M. French to their marital rights; and that the defendant would testify that such marriage was made by him in good faith. The prosecution and defense thereupon rested.

Defendant moved the court to direct a verdict in his favor, on the ground that the state had failed to prove a case, but the court refused such direction. The court charged the jury (1) that if they found the facts stipulated against the

defendant by him to be true, and they were satisfied there-
from of defendant's guilt, they should convict him; (2) that
if the conviction and sentence of William G. French had
been legal it would have been a complete defense, but the
supreme court reversed the judgment of sentence and held
the same to be invalid; (3) that as a matter of law the con-
viction of William G. French being illegal, it was no defense
which would be of any avail or benefit to the defendant.
Exceptions were taken to the refusal to instruct the jury as
requested, and for giving each of the several instructions
stated.

For the plaintiff there was a brief by the *Attorney Gen-
eral* and *L. K. Luse*, Assistant Attorney General, and a
separate brief by *R. Sleight*, district attorney of Ashland
county; and the cause was argued orally by the *Attorney
General.* They contended, *inter alia*, that the reversal of
the sentence of imprisonment of French for life related back
to the time of the sentence and rendered the sentence void
*ab initio.* The marriage relations of French and his wife
were therefore never interrupted, and the marriage of Lucy
French to the defendant *Duket* was adulterous. *Comstock v.
Adams*, 23 Kan. 513; *Crouch v. Crouch*, 30 Wis. 667; *Greene
v. Greene*, 2 Gray, 361; *Allen v. Maclellan*, 12 Pa. St. 328;
*State v. Goodenow*, 65 Me. 30, 33. See, also, *R—— v. R——*,
20 Wis. 331; *Everett v. Everett*, 60 id. 200.

For the defendant the cause was submitted on the brief
of *Tomkins & Merrill.*

PINNEY, J. 1. The exceptions present questions of some
difficulty and of great importance, namely: (1) In respect
to the validity and effect of sec. 2355, R. S., which provides
that "when either. party *shall be sentenced* to imprisonment
for life, the marriage shall be thereby *absolutely* dissolved,.
without any judgment of divorce or other legal process, and
no pardon granted to the party so sentenced shall restore:

such party to his or her conjugal rights." (2) Whether the marriage of the defendant with the former wife of French, which took place after his conviction and sentence to imprisonment for life, and while he was imprisoned under it, but before the reversal of the sentence, was rendered void by such reversal, and French was thereby restored to his former conjugal rights.

The statute in question has been in force ever since the Revision of 1849, and has not hitherto been the subject of consideration in this court. Such or similar statutes exist in Michigan and Maryland, and perhaps in other states. Prior to the adoption of the state constitution, the district courts of the territory had jurisdiction to grant divorces, on bills filed for that purpose, for specified causes (Terr. Stats. of 1839, p. 140), and the territorial legislature exercised at the same time a power of granting divorces by special acts, twenty-four of which were granted at the last session of the territorial legislature. By sec. 24, art. IV, of the constitution, it is provided that "the legislature shall never authorize any lottery, or *grant any divorce;*" and ever since the adoption of the constitution the courts have had power to grant divorces from the bonds of matrimony for specified causes, and, among others: "When either party subsequent to the marriage *has been sentenced* to imprisonment for three years or more; and no pardon granted after divorce for that cause shall restore the party sentenced to his or her conjugal rights." Similar statutes to the last have existed from an early period in other states. The contention on the part of the state is that sec. 2355, R. S., is void, in that, in effect, in the case specified, it grants a divorce, and that if valid and operative the subsequent reversal of the sentence of French avoided the marriage of his wife with the defendant, which had taken place in the meantime, and restored French to his former conjugal rights, and rendered the subsequent cohabitation of the defendant with Lucy M. French criminal.

The State vs. Duket.

The relation of two married persons to each other is not a mere personal relation or a mere contract between them, though it comes into existence in pursuance of a contract; but it is a *status* or legal condition established by law, involving, not only the well-being of the parties, but also the highest interests of society and the state, and having more to do with the morals and civilization of a people than any other institution. It has always been subject to the control of the legislature; and it has always been competent for the legislature, in the absence of constitutional restriction, to put an end to the relation, in the interests of the parties as well as of the state. Subject to this qualification, and saving the rights of property already vested in either party, the state that created the relation can change or abrogate it; and, as it is not a contract or a vested right, the law putting an end to the relation and extinguishing the *status* of the parties as husband and wife does not fall within the prohibition against the impairment of the obligation of contracts or the divesting of vested rights. The power of the state, within these limitations, over the civil *status* of its own citizens, is supreme and absolute, and the legislative will is a sufficient reason for its action. Cooley, Const. Lim. 111, 112; 1 Bish. Mar., Div. & Sep. §§ 11–15, 1426 *et seq.*, 1492; *Cook v. Cook,* 56 Wis. 207; *Shafer v. Bushnell,* 24 Wis. 372; *Maynard v. Hill,* 125 U. S. 205; *Pennoyer v. Neff,* 95 U. S. 734; *Cronise v. Cronise,* 54 Pa. St. 255, 261; *Maguire v. Maguire,* 7 Dana, 181, 183; *Starr v. Pease,* 8 Conn. 541; *Ditson v. Ditson,* 4 R. I. 87; *Noel v. Ewing,* 9 Ind. 37. In *Niboyet v. Niboyet,* 4 Prob. Div. 11, BRETT, L. J., said that: "Marriage is the fulfilment of a contract satisfied by the solemnization of the marriage; but marriage, directly it exists, creates by law a relation between the parties, and what is called a *status* of each. The *status* of an individual, used as a legal term, means the legal position of the individual in or with regard to the rest of the community. That

relation between the parties and that *status* of each of them with regard to the community which are constituted upon marriage, are not imposed or defined by contract or agreement, but by law." In *Maynard v. Hill*, 125 U. S. 205, the same conclusion was reached, and it was there held that marriage is an institution of society, regulated and controlled by public authority, and that legislation affecting it and annulling the relation between the parties is not within the prohibition of constitutional provisions against the impairment of contracts by state legislation; and the validity of legislation, whether general or special, dissolving the relation on particular grounds, is within the competency of legislative authority, unless restrained by constitutional provisions. The opinion of the court in this case, by Mr. Justice FIELD, is an elaborate and learned exposition of the law on the subject under consideration.

The power of the legislature over the subject of marriage as a civil *status* is unlimited and supreme, subject only to the restriction in the constitution that the legislature shall never " grant any divorce." This statute does not grant a divorce to any one, either absolutely or conditionally. It provides that " when either party shall be sentenced to imprisonment for life, the marriage shall be thereby absolutely dissolved without any judgment of divorce or other legal process;" that is to say, the termination of the matrimonial *status* is unconditional, for the reason that the party against whom it has been pronounced is no longer capable of performing the duties, public and domestic, of the matrimonial relation. The dissolution of the marriage is consequent upon the sentence, and results from the operation of a general law, acting uniformly and affecting alike all persons under the conditions specified in the statute, and not by special grant or in a particular instance. The legislature had the power to enact general laws prescribing the result of such a sentence upon the civil *status* of the defendant, as

The State vs. Duket.

well as the matrimonial *status* of any one to whom he might be united in marriage.

By the common law certain consequences resulted from judgment given in capital cases, namely, attainder, by which the defendant was "no longer of any credit or reputation. He cannot be a witness in any court, neither is he capable of performing the functions of another man; for, by an anticipation of his punishment, he is already dead in law." And the consequences of attainder were forfeiture and corruption of blood, which worked forfeiture of his real and personal estates. 4 Bl. Comm. 380, 381. There is no such thing as civil death in this country, and no conviction in this state can work corruption of blood or forfeiture of estate. Sec. 12, art. I, Const. Yet by general laws in this as well as other states it has been provided that certain consequences shall result from conviction or sentence for crime. We are not aware that the power to enact such laws has ever been judicially questioned. Certainly we see no ground for doubting the validity of such acts so long as they relate only to subjects within the undoubted scope of legislative power. Constitutional disqualification to exercise the right of suffrage exists, as that no "person convicted of treason or felony shall be qualified to vote at any election unless restored to civil rights." Sec. 2, art. III, Const. This is a law, merely, in its operation, but is embodied in the constitution to give it a sanction and permanency not incident to ordinary legislation to secure the purity of the ballot box. And it is provided that laws may be passed excluding from the right of suffrage all persons who have been or may be convicted of any infamous crime, and depriving every person who shall make or become directly or indirectly interested in any bet or wager dependent upon the result of any election of the right to vote at such election. Sec. 6, art. III, Const.; R. S. sec. 12, subd. 4. By sec. 4935 it is provided that, when any person sentenced to imprisonment in the

The State vs. Duket.

state prison is holding at the time any office under the constitution and laws of the state, such office shall be deemed vacated from the time of his commitment to prison, but if the judgment is reversed he shall be restored to his office, with its rights, etc., but not by reason of being pardoned.

The intent of the constitutional provision that the legislature shall not "grant any divorce" was not to restrict the legislature in the enactment of appropriate general laws, but the mischief sought to be suppressed was the granting of divorces by the legislature in special instances by special laws,— in view of the ease and facility with which such divorces might be procured, a power likely to be capriciously, improvidently, and sometimes unjustly exercised. By the constitution of the state of Michigan, in 1836, it was provided that "divorces shall not be granted by the legislature, but the legislature may by law authorize the higher courts to grant them under such restrictions as they may deem expedient;" and under this provision an act was passed authorizing the circuit court in St. Joseph county to grant a divorce between parties named therein, under the general provisions of the statute, provided it should be made to appear satisfactorily that the wife had been for the term of five years preceding the time of filing the petitioner's bill, and still continued to be, hopelessly and incurably insane; but before any decree was rendered the constitution was amended, declaring that "divorces shall not be granted by the legislature," and subsequently the divorce was granted pursuant to the act. It was held that the divorce, in effect, was a legislative one, though granted by the court, but this was upon the ground that the law in this special instance assumed that the power which it vested in the court was the power which the legislature itself was inhibited from exercising, and that it was equivalent to the granting of a divorce in a particular case and for a particular cause for which no general law of the state authorized one to be granted. *Teft*

The State vs. Duket.

*v. Teft*, 3 Mich. 67. The constitutional provision that the legislature shall not "grant any divorce" must be construed with reference to and limited by the mischiefs against which it was evidently aimed,— the granting of divorces by special acts in particular cases,— and it was not intended to otherwise limit the power of the legislature, or restrict it in the enactment of just and proper laws affecting all persons alike in their matrimonial *status* or condition.

In considering the provision "with a view to its interpretation, the thing which we are to seek is the thought which it expresses. To ascertain this, the first resort in all cases is to the natural signification of the words employed." Cooley, Const. Lim. (1st ed.), 57. Says MARSHALL, C. J.: "The framers of the constitution, and the people who adopted it, must be understood to have employed words in their natural sense, and to have understood what they meant." *Gibbons v. Ogden*, 9 Wheat. 188. When we examine the very clear and direct provision in question, we look in vain to find any expression or intimation forbidding or restraining the legislature from passing a law such as the one under consideration, general in its terms, operating alike upon all persons falling within its provisions, which does not grant or authorize the granting of any divorce, but which provides a general consequence attendant upon the life sentence of any married person, namely, that his marriage "shall be thereby absolutely dissolved." It might with as much propriety be said that the statute prescribing the punishment for murder in the first degree was a statute to imprison French during the term of his natural life, as that the statute in question was a legislative divorce granted to him from the bonds of matrimony. If it was not such divorce, it is clearly established by the authorities referred to that the legislature might lawfully enact the statute, as a law affecting in the future the *status* of all married persons, citizens of the state, who should by life sentence of imprisonment be brought within its provisions.

2. The statute was self-executing. Upon sentence given, the marriage between French and his wife was "*absolutely* dissolved." Nothing whatever remained to be done to make the dissolution operative; neither judgment of divorce nor other legal process. It was not a dissolution of the marriage *nisi*, dependent upon condition subsequent, express or implied, but was without restriction or condition. It did not suspend the conjugal relation, but extinguished it; and the language of the statute expressly excludes any implication that the reversal of the sentence might operate to restore the sentenced party to his or her conjugal rights, whatever might otherwise be the operation and effect of a reversal by the common law. The statute goes upon the ground that social and public necessities of the marriage relation, and the competency of parties to contract it, require the dissolution to be final, absolute. The statute having executed itself in the present case, French and his wife became in law as utter strangers to each other. The new *status* of each was the result of the statute, and was not dependent for continuance upon the continued existence of the sentence of French, as in the case of a judicial divorce. The reversal of the sentence cannot operate to restore the parties to their former matrimonial relations, as in the case of reversal of a valid judgment of divorce for mere error in its rendition. In states where sentence to imprisonment in the state prison for a term of years is made ground for an action of divorce, it has been held that as soon as the sentence has been given the right of the other party to apply for a divorce is complete (*Handy v. Handy*, 124 Mass. 394), and that such right is not suspended by a bill of exceptions, on which the conviction and sentence may be reversed (*Cone v. Cone*, 58 N. H. 152).

The statute declares that "no pardon granted to the party so sentenced shall restore such party to his or her conjugal rights." "A pardon reaches both the punishment prescribed

for the offense and the guilt of the offender; and, when the pardon is full it releases the punishment and blots out of existence the guilt, so that in the eye of the law the offender is as innocent as if he had never committed the offense. . . . If granted after conviction, it removes the penalties and disabilities, and restores him to all his civil rights. It makes him, as it were, a new man, and gives him a new credit and capacity. . . . But it does not restore offices forfeited or property or interests vested in others in consequence of the conviction and judgment." *Ex parte Garland,* 4 Wall. 333, 380. As a pardon granted could not restore French to his conjugal rights, manifestly it was not intended that the reversal of his sentence should have that effect.

Evidently the dissolution of the marriage freed both French and his wife from its obligations, and she was free to marry the defendant, and her subsequent marriage with him would not be in any way affected or invalidated by such reversal. It is understood that they were both citizens of this state at the time of the sentence, and subject, as to their matrimonial *status,* to its laws. Says Mr. Bishop: "Taking one party out of the marriage relation, by whatever means, leaves the other single. A husband without a wife or a wife without a husband is unknown to the law." 2 Bish. Mar., Div. & Sep. §§ 1613, 1615.

It was error for the court to instruct the jury that this court had held the sentence of French to be illegal or invalid. On the contrary, this court held that the court pronouncing sentence had jurisdiction of the subject matter of the information against French and of his person, and it denied his application to be discharged from imprisonment under the sentence, holding that the sentence was valid and could be avoided only on writ of error. *In re French,* 81 Wis. 597. And the sentence was reversed for error, and not for want of jurisdiction. *French v. State,* 85 Wis. 400. Until

it was so reversed it was a valid and operative sentence. The cases relied on to show that the reversal of the sentence restored French to his former conjugal rights were all cases where the validity of the second marriage depended upon the validity of a former decree of divorce, and, with a single exception, the decree relied on was a nullity for want of jurisdiction in the court granting it, or was void by reason of gross fraud practiced on the court or opposite party by the one claiming its protection. The case of *Crouch v. Crouch*, 30 Wis. 667, was such a case.

We hold, therefore, (1) that sec. 2355, R. S., is a valid enactment, and not in conflict with sec. 24, art. IV, of the constitution, and operated to absolutely dissolve the marriage relation between French and his wife upon his being sentenced to imprisonment for life; and (2) that the marriage thereafter of the defendant with the former wife of French was valid, and was not avoided by the subsequent reversal of the sentence against French. The defendant's exceptions are therefore sustained, and his conviction is set aside, and the cause is remanded to the circuit court for a new trial.

*By the Court.*— Judgment is ordered accordingly.