## STATE *v.* TUTTY *et al.*

*(Circuit Court, S. D. Georgia, E. D.* February 4, 1890.)

1. MARRIAGE BETWEEN WHITE PERSON AND NEGRO—STATUTES OF GEORGIA.
   By the settled policy of the state of Georgia, marriage relations between white persons and persons of African descent are forever prohibited, and by the statutes of the state such marriages are declared null and void.

2. SAME—CONSTITUTIONAL LAW.
   These statutes have been held to be in accordance with the constitution by the supreme appellate tribunal of the state.

3. SAME—CONFLICT OF LAWS.
   The statutes of the state also declare that all marriages solemnized in another state by parties intending at the time to reside in Georgia shall have the same legal effect as if solemnized in the latter state; and, further, that parties residing in Georgia cannot evade the provisions of its laws as to marriage by going into another state for the solemnization of the marriage ceremony.

4. CONSTITUTIONAL LAW—OBLIGATION OF CONTRACTS—MARRIAGE.

The contract of marriage is not a "contract," within the meaning of the provision in the constitution of the United States prohibiting states from impairing the obligation of a contract.

5. SAME.

. Marriage is more than a-contract; it is an institution which is the foundation of the family and of society. The rights and qualifications of the parties thereto depend upon the legislation of the state, as controlled for the benefit of the entire community, by principles of public policy.

6. CONFLICT OF LAWS—MARRIAGE..

Where the statutory law is silent as to the effect of marriages between persons domiciled in a state, and who leave it with the purpose to solemnize the marriage elsewhere, to evade such laws, but intending to return and live therein, the marriage may be upheld where the inhibition relates to form, ceremony, or qualifications depending on age or like condition.

7. SAME.

When, however, the marriage is inhibited by a positive policy of the state, as affecting the morals and good order of society, and leading to serious social evils, the marriage will be held void.

8. SAME.

Where the state has enacted legislation declaratory of the effect of marriages, extraterritorially, of its citizens, who by such marriages seek to evade its positive policy and penal laws, the declaratory statute affords the rule of decision.

9. REMOVAL OF CAUSES—FEDERAL QUESTION—MARRIAGE CELEBRATED IN DISTRICT OF COLUMBIA.

Where Tutty, a white man, and Ward, a negro woman, were indicted in the state courts for fornication, and thereafter repaired to the District of Columbia, and were married, immediately returning to Georgia, and thereupon attempted to remove into the United States court the indictments pending against them, the petition for removal was denied, and the indictments remanded to the court of the state.

*(Syllabus by the Court.)*

At Law. On motion to remand.

*W. Wallace Fraser*, Sol. Gen., for the State.

*James Atkins*, for defendants.

SPEER, J. It appears from the motion to remand, as well as from the petition for removal before the court, that the defendant Charles Tutty has been for many years a citizen and resident of Liberty county, in this state. The grand jury of that county presented an indictment against Tutty, charging him with the statutory crime of fornication, on the 1st day of April, 1889, and at other times, with one Rose Ward, a woman of African descent, and formerly a slave, also a citizen of the state of Georgia, and domiciled in the county of Liberty. It appears, further, that after the indictment was found the said Tutty and the said Rose Ward, or Rose Tutty, as she calls herself, repaired to the District of Columbia, and were married there, in accordance with what are understood to be the laws of the United States for that district. At the trial term of the superior court of Liberty county, to-wit, on the 3d day of December, 1889, and before the trial of the criminal indictments above mentioned, both of the parties indicted, presented to the state court petitions for the removal of the cases for trial into this, the circuit court of the United States for this district. The petitions are practically identical.. They recite the substance of the indictments. They deny the fornication. They state that the relations between the parties, which are described more in detail in the petition, "existed at a time when she (Rose Ward or Rose Tutty) was petitioner's lawful wife, or under cir-

cumstances in which he and she were and are secured from lawful prosecution in the manner attempted in said case." That petitioner had been duly married to said Rose in the District of Columbia, and the acts which are charged to have been done, "if done at all, were and are under their lawful executed contract of marriage with each other, in full accordance with the requirements of the laws then in force in said District of Columbia." Petitioners further state that the prosecution against them is based upon a law of Georgia forever prohibiting the relation of marriage between white persons and persons of African descent. That such law denies to the petitioners the right secured to them by the constitution and laws of the United States providing for equal civil rights of themselves and all other citizens of the United States to protection against the laws in a state, impairing the obligation of contracts. The Honorable ROBERT FALLIGANT, of the superior court, declined to entertain these motions; whereupon the defendants filed in this court a certified transcript of the record of the proceedings of the superior court, and on the first day of the term, the court having been notified that the Solicitor General of the eastern judicial circuit, who is the counsel representing the state of Georgia in its criminal prosecutions, would move to remand the causes to the court whence the transcript was taken, regularly assigned the hearing of the said motion for trial. The motion to remand, which the court required to be in writing, presents several grounds: (1) It is insisted the case should be remanded because the defendants made no appearance in the state court, and that their bonds were estreated; that their counsel, James Atkins, Esq., admits that he advised his client to remain away from said state court, as it was not necessary that they should be there in person when said motion for removal was made. (2) Because it appears that the indictments against the defendants charged the offense to have been committed on the 1st day of April, 1889, whereas it is not pretended that the alleged marriage took place until the 15th day of the same month. (3) Because the defendants have been citizens and domiciled in the county of Liberty for many years; that the defendant Rose Ward was born a slave; that they removed to Chatham county after the finding of the indictment, but that while domiciled in the county of Liberty, and citizens of the state, they went to the District of Columbia, and were married there in order to evade the laws of the state of Georgia, prohibiting marriages between whites and blacks, and that immediately after said marriage they returned to the county of Liberty. The defendants filed affidavits to the effect that their lives would have been in danger had they attended court in Liberty county, as they were bound to do by their bond, but they do not indicate any satisfactory or credible ground for the statement. Without bestowing very great attention on the technical reasons urged for remanding these cases, it is, in the opinion of the court, the wisest and best course to consider and decide the motion upon the grave and important question which it presents.

Does the law of the state, which prohibits and makes void a marriage between individuals of the Caucasian and of the African races, deprive

the parties in this case of their rights guarantied to them by the constitution and laws of the United States; or, to state the question as it is more narrowly presented by the petition of the defendants, do these statutes of the state have the effect to violate the obligation of a marriage contract, in the sense in which the constitution of the United States inhibits state action which violates the obligation of a contract? It would, perhaps, be impossible to overstate the importance of this question under the grave and unsettled relations which exist between the distinct races now inhabiting a large portion of these United States, and it will be neither wise nor patriotic for the court to evade the vital point of decision, as might perhaps be done in this case.

By a settled policy of this state,—a policy adopted with the purpose to preserve, as far as the laws may accomplish that result, the purity and distinctness of the races inhabiting the state,—it is declared, (Code, § 1708:)

"The marriage relation between white persons and persons of African descent is forever prohibited, and such marriages shall be null and void."

Section 4572, Code, affixes the penalty for adultery or fornication between individuals of the races, and under this section the indictments against the defendants were found.

Section 1710 of the Code provides as follows:

"All marriages solemnized in another state by parties intending at the time to reside in this state shall have the same legal consequences and effect as if solemnized in this state. Parties residing in this state cannot evade any of the provisions of its laws as to marriage by going into another state for the solemnization of the marriage ceremony."

It will thus be seen how clearly recognized and distinctly fixed is the purpose of the state of Georgia to prohibit within its borders, miscegenation, as the result of marriages between the white and black races. These statutes have received judicial construction by the supreme court of the state at a period when its judges were widely known, not alone for their conservatism, their devotion to the constitution of the common country, their broad and tolerant liberality of opinion, but also for their profound learning and conspicuous intellectual power.

In *Scott* v. *State*, 39 Ga. 321, this decision may be found: Leopold Daniels, a Frenchman, had married Charlotte Scott, a negro woman. They were indicted for cohabiting, and thus the question arose. Chief Justice JOSEPH E. BROWN pronounced the unanimous opinion of the court, of which the other members were the Honorable H. K. McCAY, more lately the United States judge for the Northern district of Georgia, and the Honorable HIRAM WARNER, afterwards himself the illustrious Chief Justice of the state. Of the law, Chief Justice BROWN makes these observations:

"I do not hesitate to say that it was dictated by wise statesmanship, and has a broad and solid foundation in enlightened policy, sustained by sound reason and common sense. The amalgamation of the races is not only unnatural, but it is always productive of deplorable results. Our daily observations show us that the offspring of these unnatural connections are generally sickly

and effeminate, and that they are inferior in physical development and strength to the full blood of either race. It is sometimes urged. that such marriages should be encouraged for the purpose of elevating the inferior race. The reply is that such connections never elevate the inferior race to the position of the superior, but they bring down the superior to that of the inferior. They are productive of evil, and evil only, without any corresponding good."

The court was unanimous that the law was constitutional, and the conviction of the parties was affirmed.

An identical conclusion was reached by this court, Judge ERSKINE pronouncing the decision, in the *Case of Hobbs*, a white man, and Martha Johnson, a colored woman, (1 Woods, 537.) The section of the Code above quoted was interpreted, and was held to be not an infraction of the fourteenth amendment of the constitution of the United States, or of the laws congress has made for its enforcement. In the course of his opinion, page 540, Judge ERSKINE said:

"Nor, I apprehend, is marriage considered to be embraced within that clause of section 10 of article 1 of the national· constitution which prohibits the state from passing any law impairing the obligation of contracts."

He quotes the declaration of Chief Justice MARSHALL in *Dartmouth College* v. *Woodward*, 4 Wheat. 518, that "the provision of the constitution never has been understood to. embrace other contracts than those which respect property or some object of value, and confer rights which may be asserted in a court of justice. It never has been understood to restrict the general right of the legislature to legislate on the subject of divorce." In another part of the opinion, the same great magistrate said: "The framers of the constitution did not intend to restrain the states in the regulation of their civil institutions, adopted for internal government." Judge ERSKINE concludes that it is plain that the institution of marriage is not technically a contract, nor can it be said to be related to property. He quotes the declaration of Mr. Bishop: "All our marriage and divorce laws  *   *   *   are state laws and state statutes; the national power with us not having legislative or judicial cognizance of the matter within these localities." 1 Bish. Mar. & Div. § 87. Calling attention to the fact that the state marriage regulations did not deny to a citizen the equal protection of the laws,—for the punishment or penalty adjudged to the colored citizen found guilty of fornication is like that, and none other, which is inflicted on the white citizen,—he holds that the sections of the Code of Georgia which inhibit marriage between white persons and persons of African descent, and which provide for the punishment of the colored and white persons who are found guilty of the crime of fornication, are not in violation of the constitution of the United States, and the relators were remanded to the state courts. The conclusion of Judge ERSKINE, that the marriage contract is not contemplated by the prohibition of the constitution of the United States against the impairment of contracts by state legislation, has been, subsequently to the rendition of the decision above quoted, fully sustained by two decisions of the supreme court of the United States. In the case of *Maynard* v. *Hill*, 125 U. S. 190, 8 Sup. Ct. Rep. 723, it was held that marriage

is something more than a mere contract, though founded upon an agreement by the parties. When once formed, a relation is created between the parties which they cannot change, and the rights and obligations of each depend not upon their agreement, but upon the law, statutory or common. It is an institution of society, regulated and controlled by public authority. Legislation, therefore, affecting this institution, or annulling a relation between parties, is not within the prohibition of the constitution of the United States against the impairment of a contract by such legislation. It may be observed that this decision was rendered upon the effect of territorial legislation annulling a marriage. *A fortiori* this announcement will control with reference to the legislation of a state. The language of Mr. Justice FIELD is peculiarly apposite and instructive with reference to the important controversy before the court. On page 205, 125 U. S., and page 726, 8 Sup. Ct. Rep., of the decision, he declares: "Marriage, as creating the most important relation in life, as having more to do with the morals and civilization of a people than any other institution, has always been subject to the control of the legislature." He cites many cases where the legislatures of states have annulled marriages. He calls attention to the fact that this power was formerly exercised by the parliament of England; and it may, with reason, be asked, if this power has been formerly exercised by state legislatures after a marriage has been contracted, may it not, with more of force and reason, be exerted to prevent the marriage, if it would be objectionable and contrary to public policy? Upon the main point on which the defendants here rely, the learned justice says:

"The only inconsistency suggested is that it impairs the obligation of the contract of marriage. Assuming that the prohibition of the federal constitution against the impairment of contracts by state legislation applies equally, as would seem to be the opinion of the supreme court of the territory, to legislation by territorial legislatures, we are clear that marriage is not a contract, within the meaning of the prohibition."

He quotes the language of Chief Justice MARSHALL, quoted *supra*. With reference to marriage, he says:

"It is an institution in the maintenance of which in its purity the public is deeply interested, for it is the foundation of the family and of society, without which there would be neither civilization nor progress. This view is well expressed by the supreme court of Maine in *Adams* v. *Palmer*, 51 Me. 481, 483."

It will be interesting and important to consider the language of this case, which Justice FIELD quotes with approval. Chief Justice APPLETON declares:

"When the contracting parties have entered into the married state, they have not so much entered into a contract as into a new relation, the rights, and duties, and obligations of which rest not upon their agreement, but upon the general law of the state, statutory or common, which defines and prescribes those rights, duties, and obligations. They are of law, not of contract. * * * Their rights under it are determined by the will of the sovereign, as evidenced by law. * * * It is not, then, a contract, within the meaning of the clause of the constitution which prohibits the impairing the obligations of contracts. It is, rather, a social relation, * * * the

creation of the law itself. A relation the most important, as affecting the happiness of individuals; the first step from barbarism to incipient civilization; the purest tie of social life; and the true basis of human progress."

And the learned chief justice cites, in support of this opinion, the case of *Maguire* v. *Maguire*, 7 Dana, 181, 183, and *Ditson* v. *Ditson*, 4 R. I. 87, 101. In the first of these, the supreme court of Kentucky held that marriage was more than a contract; that it was the most elementary and useful sovereign power of the state, and might be abrogated by the sovereign will whenever the public good would thereby be subserved; that, being more than a contract, and depending especially upon the sovereign will, it was not embraced by the constitutional inhibition of legislative acts impairing the obligation of contracts. The supreme court of Rhode Island, in the case above quoted, declares it is not a contract in the sense in which the obligation may not be impaired, but one of the domestic relations. In *Wade* v. *Kalbfleisch*, 58 N. Y. 282, it is declared to be more than a contract, its relations always regulated by the government. It partakes more of the character of an institution, regulated and controlled by public authority, upon principles of public policy, for the benefit of the community. In *Noel* v. *Ewing*, 9 Ind. 37, it is declared to be, "in every enlightened government, pre-eminently the basis of civil institutions, and thus an object of the deepest public concern."

The illustrious Story, in his great work on the Conflict of Laws, (paragraph 108, note,) fully sustains this view:

"It follows, within the full precincts of absolute and paramount administration by the controlling authority, that the marriage contract is not within the provision of the inhibitory clause of the constitution denying to the state the power to impair contracts."

This doctrine has been repeated by the supreme court of the United States in the case of *Hunt* v. *Hunt*, App. 131 U. S. clxv.:

"The contract of marriage is not a contract, within the meaning of the provision in the constitution prohibiting states from impairing the obligation of contracts."

In the case of *Kinney* v. *Com.*, 30 Grat. 858, the precise question in this case was decided adversely to the defendants here. There a negro man and a white woman, domiciled in Virginia, went, as in this case, to the District of Columbia, and were regularly married, and, after remaining there 10 days, returned to their home in Virginia, and continued to reside there as husband and wife. The law of Virginia, like the law of Georgia, prohibits marriages between white persons and negroes. It was held that the parties were liable to indictment in Virginia for lewd and lascivious cohabitation; that the marriage in the District of Columbia was a mere evasion of the laws of Virginia, and could not be pleaded in bar of the prosecution. The case is therefore precisely in point. There the argument was made that the laws of a state, with reference to marriage, could not operate *extra territoriam*. Conceding the general rule, the learned court proceeded to point out the exceptions, citing Mr. Justice Story in his work on the Conflict of Laws, § 113*a:*

"The most prominent, if not the only, known exceptions to the rule, are those marriages involving polygamy and incest,—those positively prohibited by the law of a country upon motives of policy."

The case at bar would seem clearly within the latter classification. Reference is made in the opinion from which we quote to the case of *Brook* v. *Brook*, 9 H. L. Cas. marg. p. 193, bottom p. 145. In that case William Lee Brook married in Denmark Mrs. Emily Armitage, his first wife's sister. The parties were lawfully domiciled in England, and had gone to Denmark on a temporary visit. The marriage was lawful in Denmark. In a suit among the heirs of Brook, Vice-Chancellor STUART, with whom sat Mr. Justice CRESWELL, held that the marriage in Denmark was, by the well-known law of England upon the subject, wholly invalid. The case was appealed to the house of lords, and was there considered with great carefulness. Opinions were rendered by the Lord Chancellor CAMPBELL, Lord CRANWORTH, Lord ST. LEONARDS, and Lord WENSLEYDALE. The Lord Chancellor declared:

"While the forms of entering into the contracts of marriage are to be regulated by the *lex loci contractus*, * * * the essentials of the contract depend upon the *lex domicilii*. * * * If the contract of marriage is such in essentials as to be contrary to the law of the country of domicile, and it is declared void by that law, it is to be regarded as void in the country of domicile, though not contrary to the law of the country in which it was celebrated."

All the law lords concurred with the opinion of the Lord Chancellor. The same doctrine is affirmed in this country, in North Carolina, (*Williams* v. *Oates*, 5 Ired. 535; *State* v. *Kennedy*, 76 N. C. 251; *State* v. *Ross*, Id. 242;) and in Louisiana, (*Dupre* v. *Boulard*, 10 La. Ann. 411;) and the circuit court of the United States for the district of Virginia seems to have concurred in the opinion of the state court, in *Kinney* v. *Com.*, above cited, (*Ex parte Kinney*, 3 Hughes, 1.)

The principle, as we have seen, is made the law of the state of Georgia by the express statute quoted above. By statute, and by unbroken authority then, except by the case of *Medway* v. *Needham*, decided in Massachusetts, such marriages, between parties domiciled at the time in the state, as are declared void by the laws of the state, will be held invalid, no matter where they were contracted.

The case of *Medway* v. *Needham*, 16 Mass. 157–161, was the occasion of an interesting and learned discussion of the conflict of laws relative to marriage, and especially of the validity of marriages between persons domiciled in a state who temporarily left it to evade its marriage laws, (Story, Confl. Laws, 5th Ed., 230, note,) in which the distinguished author, with much of warrant in the renown of its courts and the learning of its judges, favors, not unnaturally, the ruling in Massachusetts. An attentive consideration of the reasoning of the text and the note will make it appear, however, that the author did not have in mind a case like that under consideration here. The true rule is stated with satisfactory clearness in the recent case of *Pennegar* v. *State*, 10 S. W. Rep. 305, (decided by the supreme court of Tennessee on January 29, 1889.)

Stating the general rule that a marriage valid where celebrated is valid everywhere, the court calls attention to the exceptions. Of these the most important is a marriage, which the local law-making power has declared shall not be allowed any validity, either in express terms or by necessary implication. Marriages of this class are divided by the court into two subdivisions: (1) Where the statutory prohibition relates to form, ceremony, and qualifications; (2) marriages which are "prohibited by positive state policy, as affecting the morals or good order of society." Justice FOLKES for the court presented the distinction in the following language: "Where the statutory inhibition relates to matters of form or ceremony, and in some respects to qualification of the parties," it is declared that "the courts would hold such marriage valid here; but, if the statutory prohibition is expressive of a decided state policy as a matter of morals, the courts must adjudge the marriage void as *contra bonos mores.*" To illustrate the proposition, the court cites the case of *State* v. *Bell,* 7 Baxt. 9, where a marriage between a white person and a negro, valid in Mississippi, where celebrated, and where the parties were domiciled at the time of the marriage, was held void in Tennessee. There is in Tennessee, as in Georgia, a highly penal statute on this subject, and the court alludes in vigorous language to the "demoralization and debauchery involved in such alliance." Referring to the criticisms made in *Medway* v. *Needham,* by the Lord Chancellor in *Brook* v. *Brook,* 9 H. L. Cas. 193, and the criticism of the latter case in *Com.* v. *Lane,* 113 Mass. 458, and to the case of *Putnam* v. *Putnam,* 8 Pick. 433, the court calls attention to the significant fact that in *Putnam* v. *Putnam* the supreme court of Massachusetts says:

"' If it shall be found *inconvenient* or repugnant to *sound principle,* [the italics are ours,] it may be expected that the legislature will explicitly enact that marriages contracted within another state, which if entered into here would be void, shall have no force within this commonwealth.' The legislature did shortly thereafter so enact; whether because the doctrine laid down in the case was inconvenient, or because repugant to sound principles, does not appear."

Justice FOLKES, in his interesting opinion, quotes also from the opinion of the Lord Chancellor in *Brook* v. *Brook, supra,* the following observation relative to *Medway* v. *Needham:*

"*Medway* v. *Needham* is entitled to but little weight, and is based upon decisions which relate to form and ceremony of marriage. If a marriage is absolutely prohibited in any country as being contrary to public policy, and leading to social evils, I think that the domiciled inhabitants of that country cannot be permitted, by passing the frontier and entering another state in which the marriage is not prohibited, to celebrate a marriage forbidden by their own state, and, immediately returning to their own state, to insist on their marriage being recognized as lawful."

We may add, with reference to the law and the policy of Georgia, that, whatever may be the difference between courts or countries in the opinion held and enforced upon this vital topic, this state, by its declaratory statute, has distinctly withdrawn its jurisprudence from the domain of the debate. The statute is the rule as to persons domiciled in

Georgia. "All marriages solemnized in another state, by parties intending at the time to reside in this state, shall have the same legal consequences and effect as if solemnized in this state. Parties residing in this state cannot evade any of the provisions of its laws as to marriage by going into another state for the solemnization of the marriage ceremony." This authoritative and precise announcement of the policy of the state upon a subject which involves the character of its population and citizenship, and, as we have seen, repeatedly declared by the supreme appellate court of our country exclusively within the precincts of state control, affords the rule for our guidance here. The general rule upon which the petitioners rely, viz., that a marriage valid where celebrated is valid everywhere, depends upon international comity,—a jurisprudence existing in the sense of mutual interest, mutual benefits, and mutual obligations to cultivate peace and harmony." Story, Confl. Laws, 183. But of international comity, it was said by Chief Justice TANEY in the decision in *Bank* v. *Earle*, 13 Pet. 589: "It is the voluntary act of the nation by which it is offered, and is inadmissible when contrary to its policy or prejudicial to its interest." That marriages between individuals of Caucasian and of African blood are contrary to the policy of Georgia we have seen. Whether it is prejudicial to the state is for Georgia to determine. We have seen that the national constitution is not infringed. It is true that in certain senses the states of the American Union are not independent nations. For all national purposes embraced by the federal constitution, the states and the citizens thereof are one, entitled under the same sovereign authority, and governed by the same laws. In all other respects the states are foreign to and independent of each other. *Buckner* v. *Finley*, 2 Pet. 589, opinion by Mr. Justice WASHINGTON. See, also, *Dickins* v. *Beal*, 10 Pet. 573; *Rhode Island* v. *Massachusetts*, 12 Pet. 719; *Phillips* v. *Payne*, 92 U. S. 132. And the fourteenth amendment to the constitution does not limit the power of the state to protect its citizens. *Railway Co.* v. *Beckwith*, 129 U. S. 26, 9 Sup. Ct. Rep. 207.

The court will not discuss the argument of defendants' counsel to the effect that the intermarriages of whites and blacks do not constitute an evil or an injury against which the state should protect itself. This is a question which has been, as we have seen, the subject of repeated judicial deliverances; but it is more properly, in the opinion of this court, within the range of legislative duty. It is enough, for the purpose of its duty, for the court to ascertain that by a legitimate and settled policy the state of Georgia has declared such marriages unlawful and void; for while, in this country, the home life of the people, their decency and their morality, are the bases of that vast social structure of liberty, and obedience to law, which excites the patriotic pride of our countrymen and the admiration of the world, and while these attributes of our citizenship should be cherished and protected by all in authority, and the creatures who defy them should be condemned by all, the courts, in their judicial functions, are rarely concerned with the policy of the laws which are made to protect the community. The policy of the state upon this subject has been declared, as we have seen, by its su-

preme court as well as by its statutes, and it is enough to say that this court is unable to discover anything in that policy with which the federal courts have the right or the power to interfere. A further discussion of the topic might give unmerited pain to many who are wholly irresponsible for a condition which would make them keenly sensitive in its hearing or knowledge.

It may not be improper to state that the evils comprehended in this general subject are decreasing. This the observation and testimony of superintendents of public instruction, who have the opportunity to observe large numbers of colored children, prove to be true. Upon every possible consideration, this must be deemed an important, indeed an absolutely necessary, step towards the amelioration of their condition, and the permanent advancement of the race; and to disregard the praiseworthy purposes and efforts of the colored people themselves, whether by nullifying the laws made to prevent miscegenation, or by ignoring the vicious practices of the licentious, would be as cruel to that race as it would be injurious to society, destructive to social order, and ruinous to the future of a large portion of the country,—a future with which the prosperity of the whole country is indissolubly connected. The questions presented are decided adversely to the defendants, and the indictments must be remanded to the state court, whence they were removed.