EGGERS et al. v. OLSON et al.

No. 13241—Opinion Filed Oct. 7, 1924.

Rehearing Denied Dec. 16, 1924.

**1. Marriage—Miscegenation — Prohibited — Statute.**

Sections 7499 and 7500, Comp. Stat. 1921, are intended to apply to all persons, resident or otherwise, in this state, and are intended to prohibit marriage of the descendants of the African race with any other race.

**2. Same—Evasion by Residents Going to Another State for Marriage.**

Under the provisions of the above statutes persons domiciled in this state cannot evade the inhibition of the law by going to another state, and there marrying and then returning to this state to reside and have such marriage recognized by the law of this state. Such marriage is void and confers no rights of person or property.

**3. Same—Prohibited Marriage as Subject of Inquiry.**

A prohibited marriage under state law may be inquired into in any proceeding in which the fact of marriage may be material.

**4. Same—Construction of Marriage Contract—Effect of Illegality.**

The statutes of the various states define marriage as a status fixed by civil contract, and our courts have held that because of the far-reaching results of this status upon the body politic, the contract must be construed in its relation to society and the

state. The parties to the marriage cannot shun the burdens resulting from their illegal acts, neither can they profit by the illegal contract.

**5. Same—Miscegenation—Marriage in Another State.**

For a resident or citizen of this state, marriage, under section 7499, Comp. Stat. 1921, is void whether contracted in this state or out of this state, because the statute forbids it and it is impossible of ratification by time or change or conduct of the parties and no rights of person or property are conferred by such marriage.

**6. Same—Effect Upon Heirship.**

A descendant of the African race, a citizen and resident of this state, who goes through with the form of marriage in this state or in some other with an Indian citizen of this state and continues his residence in this state, acquires no legal rights of person or property by such marriage and where such parties go out of this state and go through with the form of marriage in the state of Arkansas, and return to this state and the woman dies without issue, leaving an estate of lands, and a father and mother surviving her, and the African husband surviving, he is not an heir and any deed given by him conveying an interest in the land is void.

**7. Quieting Title—Punitive Damages.**

In an action to quiet title against one who has knowingly and willfully and without proper regard for the rights of the legal owner clouded the title, plaintiff is entitled to actual and punitive damages under article 1, chapter 36, Comp. Stat. 1921.

(Syllabus by Threadgill, C.)

Commissioners' Opinion, Division No. 3.

Error from District Court, Pittsburg County; Harve L. Melton, Judge.

Action by Joseph Eggers against Elizabeth J. Olson, Elizabeth J. Olson, administratrix of estate of Olee M. Olson, deceased, Milton Olson, Charles Olson, Millie Olson, Elizabeth J. Olson, guardian of Milton, Charles, and Millie Olson, minors. D. Nottage and wife were made parties defendant by order of court. Judgment for defendants Olson, and plaintiff Eggers and defendant Nottage appeal. Affirmed.

A. C. Sewell and Wilson & Wilson, for plaintiffs in error.

Frank G. Anderson, for defendants in error.

Opinion by THREADGILL, C. The action in this case was brought in the district court of Pittsburg county by Joseph Eggers, as plaintiff, against Elizabeth J. Olson, administratrix of the estate of Olee M. Olson, deceased, Milton Olson, Charles Olson, Millie Olson, Elizabeth J. Olson, guardian, for and on behalf of Milton Olson, Charles Olson, and Millie Olson, minors, as defendants, for the purpose of quieting title in and to 188.94 acres of land situated in Pittsburg and Haskell counties. By application of defendants, D. Nottage and his wife, A. B. Nottage, were made parties defendant to the action.

The facts in the case are substantially as follows:

The lands in controversy were allotted to Emily Lewis, a restricted Choctaw Indian, who died April 27, 1915. About two years prior to her death she went out of the state with a negro by the name of William Yates and married him at Ft. Smith in the state of Arkansas on April 13, 1914, and after about a week returned to her home with him in Haskell county, where they lived together until her death. She left no children, but a father, Thompson Aaron, and a mother, Nancy Riddle, survived her. On February 10, 1919, William Yates, for a valuable consideration, deeded an undivided one-half interest in the land in Haskell county to D. Nottage, which deed was filed for record February 12, 1919, and recorded in Haskell county, and on same date, for a valuable consideration, deeded the land in Pittsburg county to D. Nottage, which deed was filed for record February 10, 1919, and recorded in Pittsburg county. D. Nottage, joined by his wife, A. B. Nottage, for a valuable consideration, by two deeds conveyed the lands to his son-in-law, Joseph Eggers, of Two Rivers, Wis. This was the chain of title claimed by the plaintiff Eggers, and upon which he bases his right to quiet his title.

On May 18, 1915, Thompson Aaron, the father of the allottee, and his wife, Lydia Aaron, and one Thompson Lewis, and his wife, Lydia Lewis, sold their interest in the lands for a valuable consideration, and deeded same to Olee M. Olson, which deed was recorded in Haskell and Pittsburg counties, and June 1, 1915, Nancy Riddle, mother of the allottee, joined by her husband, Coleman Riddle, sold and deeded the lands to Olee M. Olson, and said deed was recorded in both counties. On June 30, 1915, the county court of Haskell county, by order, approved this deed. On March 18, 1918, the same Nancy Riddle and Coleman Riddle, for a valuable consideration, deeded the same lands to Elizabeth J. Olson, which deed was recorded in both counties, and on March 26, 1918, this deed was approved by the county judge of Haskell county. On December 24, 1919, Joseph Egger and Annie Egger, his wife, for a valuable con-

sideration, deeded 40 acres of the land in Haskell county to Elizabeth J. Olson, Milton, Charles, and Millie Olson. On February 8, 1918, by a suit to cancel deeds and quiet title, Nancy Riddle and the defendants obtained a judgment in the district court of Haskell county, against William Yates, J. W. and Duke Frederick, and T. W. Winston, quieting title in the plaintiff against a mortgage interest in the said lands.

The principal issues raised in the trial of the case were whether or not William Yates, the negro husband of Emily Lewis, deceased, had any interest in the land, and whether or not the defendant Olsons were entitled to damages against the plaintiff Eggers, and the defendant D. Nottage, in clouding the title of the land. These issues were tried to a jury, and on the first issue the court directed a verdict in favor of the defendant Olsons, and on the second issue the jury, under the instructions of the court, considered these issues and returned a verdict in favor of the defendant Olsons, and the plaintiff and D. Nottage appealed by petition in error and case-made.

1. The defendant Olsons filed a motion to dismiss the appeal, which has been ordered overruled, and the appeal is now before us on the merits.

The plaintiffs in error contend that William Yates was not the legal husband of Emily Lewis, the allottee, the marriage being prohibited by the law of the state.

Section 7499, Comp. Stat. 1921, reads as follows:

"The marriage of any person of African descent, as defined by the Constitution of this state, to any person not of African descent or the marriage of any person not of African descent to any person of African descent shall be unlawful and is hereby prohibited within this state."

Section 7500 makes such a marriage a felony. The constitutional provision referred to, article 23, section 11, reads as follows:

"Wherever in this Constitution and laws of this state, the word or words 'colored' or 'colored race', 'negro' or 'negro race' are used, the same shall be construed to mean or apply to all persons of African descent. The term 'white race' shall include all other persons."

These provisions of our law apply to all persons, citizens, residents, and transients in the state, and are intended to prohibit marriage of the descendants of the African race with any other race in this state.

2. A great many of the states of the union have similar statutes, and they are commended and upheld by the great weight of authority. In 18 R. C. L., section 31, page 409, the author, discussing this subject, uses the following language:

"Civilized society has the power of self-preservation, and marriage being the foundation of such society, most of the states in which the negro forms an element of any note have enacted laws inhibiting intermarriage between the white and black races; and the courts, as a general rule, have sustained the constitutionality of such statutes. Where such prohibition is contained in a state Constitution it is self-acting in the absence of any other provision in the same instrument limiting its operation. Statutes forbidding intermarriage by the white and black races were without doubt dictated by wise statesmanship, and have a broad and solid foundation in enlightened policy, sustained by sound reason and common sense. The amalgamation of the races is not only unnatural, but is always productive of deplorable results. The purity of the public morals, the moral and physical development of both races, and the highest advancement of civilization, under which the two races must work out and accomplish their destiny, all require that they should be kept distinctly separate, and that connections and alliances so unnatural should be prohibited by positive law and subject to no evasion."

In Ross v. Bryant, 90 Okla. 300, 217 Pac. 364, Justice Branson, in discussing the right of a state to fix the marriage status of its citizens, approves the rule laid down in Capigian v. Der Minassian, 99 N. E. 264, a Massachusetts case, which is as follows:

"Every sovereign state may determine the status of those having their domicile within its territory and the law of the domicile of the parties governs the status of marriage."

Also quotes the rule laid down in the Estate of Stull, 63 Am. St. Rep. 776, as follows:

"If a man and woman, citizens of the same state, and subject to an absolute statutory provision against entering into a marriage contract which is against good morals, leave their domicile and enter another state, where a marriage between them is not prohibited and there marry, for the purpose of evading the law of their domicile, such marriage is void in the state having the prohibition. Persons domiciled in one state where marriage between them is absolutely prohibited cannot evade its laws and policy by going to another state, and there marrying and then returning to the home state to reside. Such marriage is void in the latter state."

Then Justice Branson continues:

"Under the above quoted Oklahoma statute defining marriage, it is something more than

a civil contract. It is a civil status in which the state is vitally interested. The state of the domicile of the parties. being interested in the marriage status to be created, has a right to determine, by legislative enactment, the competency of the parties to enter into the marriage relation, their obligations each to the other during the continuance thereof, and the circumstances and conditions under which it may be terminated, and the state of the domicile of the parties intending to enter into the marriage relation has the exclusive right to prescribe all terms, conditions and limitations which are binding upon the parties, although the law of the jurisdiction in which the marriage contract was entered into may have permitted the marriage within its borders. Brook v. Brook (Eng.) 11 Eng. Rep. 703; Roth v. Roth, 104 Ill. 35; State v. Fenn (Wash.) 92 Pac. 417; Lanham v. Lanham (Wis.) 117 N. W. 787; Kenny v. Commonwealth (Va.) 30 Grat. 858; State v. Tuttle, 41 Fed. 753; Succession of Gabisso (La.) 44 South. 438; Cunningham v. Cunningham (N. Y.) 99 N. E. 845."

In the first paragraph of the syllabus this case lays down the following rule:

"Marriage is a social status which the state has a right to control. The public policy of the sovereign state as found by express legislative enactments, as to the competency of its citizens to enter into the relation, must be respected by them. Persons incapable of contracting such a relation in the state of their domicile by reason of want of age cannot successfully evade the controlling force of its laws by going to another jurisdiction where the law does not impose the inhibition."

This rule finds support in the holding of the following cases: State v. Tuttle, 41 Fed. 753; United States v. Rogers, 109 Fed. 886; Sturges v. Sturges (Ore.) 93 Pac. 696; Kinny v. Commonwealth (Va.) 30 Grat. 858; Pennegar v. State (Tenn.) 10 S. W. 305; State v. Bell (Tenn.) 7 Baxter 9; State v. Fenn (Wash.) 92 Pac. 717; Johnson v. Johnson (Wash.) 106 Pac. 500.

From these authorities we must conclude that the marriage of William Yates with Emily Lewis was prohibited by the laws of this state, and they could not, while citizens of this state, evade the law of marriage by going out of the state and marrying under the laws of another state, and then return to this state to live and maintain the marriage assumed in that state, which was prohibited in this state, and expect the marriage to be recognized and protected in this state. The inhibition is not only against the form, but the substance also. Plaintiff does not furnish us with any authority for sanctioning a marriage of this character.

In the trial of the case the defendant Ol-

sons introduced and relied on the judgment they obtained against the negro, Yates, declaring his marriage to the allottee unlawful and void, and quieting their title in the land against him, and the plaintiff contends that this judgment is invalid and contrary to the Constitution of the United States, depriving him of his rights to the lands involved on account of his race and color. We cannot agree with this contention. The marriage was unlawful and prohibited under penalty of committing a felony, and, although contracted and sanctioned under the laws of an adjoining state, it was void and possessed none of the rights of marriage under the laws of this state, and this being the case it was subject to be passed on by a court of equity in a suit to quiet title, and, the court acquiring jurisdiction, the judgment rendered would be binding upon all parties. Our court, with many others, has held that a prohibited marriage under state law may be inquired into in any proceeding in which the fact of marriage may be material. Fernow v. Jones, 34 Okla. 694, 126 Pac. 1015; Re-Gregorson's Estate, 160 Cal. 21; In re Newlin's Estate, 231 Pac. 313.

We must, therefore, conclude the judgment objected to was a legal and binding judgment, and was conclusive of the rights of Yates in the lands of the allottee.

4. Section 7488, Comp. Stat. 1921, defines marriage as follows:

"Marriage is a personal relation arising out of a civil contract to which the consent of parties legally competent of contracting and of entering into it is necessary; and the marriage relation shall only be entered into, maintained or abrogated as provided by law."

Section 7489 defines and prohibits the marriage of persons related in certain degrees by blood or marriage, and declaring such marriages illegal and void.

Section 7490 defines the qualifications of marriage, but excepts minors under 18 years for males and 15 years for females, and section 7499, prohibits marriage of any one of the African race with anyone not of the African race.

Our courts have held that while marriage is a status fixed by civil contract, yet because of its far-reaching consequences upon society and the state, that in many of its essential elements the contract out of which it arises must be construed and applied in relation to society and the state. In the case of Willets v. Willets, 76 Neb. 228, 107 N. W. 379, 5 L. R. A. (N. S.) 767, the court in dealing with this subject, uses the following language:

"While our law defines marriage as a civil contract (sec. 1, c. 52, Comp. St. 1903), it differs from all other contracts in its far-reaching consequences to the body politic itself, and for that reason, in dealing with it or the status, resulting therefrom, the state never stands indifferent, but is always a party whose interest must be taken into account."

And this language is quoted with approval by our court in the case of Hunt v. Hunt. In this case our court was dealing with the question of whether or not a boy under 18 marrying a girl under 15 could in a court of equity have the marriage annulled because illegal and escape the burden of supporting the child and mother of such marriage, and the court held he could not. The plaintiff cites this case in support of his contention that a contract of marriage although illegal is not necessarily void, but while this is true and the plaintiff's contention on this point is correct, yet the great principle announced, as to the consequences of such marriage and the rights resulting to the parties, and the interest and demands of the body politic, is against the plaintiff. He could not shun the burden of his illegal acts, neither can he profit by them.

5. The plaintiff contends that his marriage was not void, but at most was only voidable, because the statute does not declare it void. It will be observed that the statute declares such marriage unlawful, and brands it with a felony. The rule of interpretation in such a case is laid down by the Minnesota court in State v. Yoder, 113 Minn. 503, 130 N. W. 10, and quoted and approved by this court in Fernow et al. v. Jones et al., 34 Okla. 694, 126 Pac. 1016, as follows:

"And in this connection it may be safely said t at a marriage is not absolutely void in any case not expressly so declared by law, when by the subsequent conduct of the parties it may be ratified, confirmed, or made valid by cohabitation."

The court had under consideration an incestuous marriage, which could not "be recognized or tolerated in this state under any circumstances, even in the settlement of suits for seduction or bastardy," The court stated:

"We recognize the danger of undertaking to lay down a general rule, and it seems to us that it is not far wrong to say a marriage may be considered voidable when it is possible under any circumstances for the plaintiffs to contract the marriage, or subsequently to ratify it, while it should be considered void if it is impossible for them under the law to contract it, and if it is impossible for them subsequently by any conduct to ratify it, if the statute expressly declares that it is void."

In the case at bar the marriage was impossible under the statute. Going out of the state to escape the statute, and going through the form of marriage in a state where the inhibition did not exist, and soon thereafter returning to this state, and all in an effort to accomplish indirectly what cannot be done directly, would be a fraud upon the laws of this state by a citizen of this state, and such a marriage can not be recognized by the courts, neither can it be ratified or in any manner become legal, by time, or change, or age, or conduct of the parties. The inhibition, like the incestuous marriage, is in the blood, and the reason for it is stronger still. In re Lewis Estate, 42 Okla. 478, 142 Pac. 305. Applying this rule, William Yates acquired no legal rights by his Arkansas marriage with Emily Lewis, and upon her death, had no inheritable interest in her lands.

6. The parties in their briefs discuss the question of whether or not the plaintiff was an innocent purchaser for value, but taking the view that the marriage was absolutely void, and further indulging the presumption that every one is charged with knowing the law, we do not deem it necessary to consider this question. Upon the whole record we must hold that William Yates had no interest in the lands in controversy, and the title claimed by Joseph Eggers was without any legal foundation, and it was not error for the court to cancel this title and quiet the title to the land in the defendant Olsons.

7. This brings us to the second decisive question in the case, whether or not the defendant Olsons had a right to have the defendant Nottages made parties to the action, and damages for attorneys fees, and expenses, and exemplary damages against the plaintiff and D. Nottage for clouding their title to the land.

The plaintiff contends there is no provision of the statute for damages in attorney's fees and expenses incidental to the defense in an action of this character, except the costs which follows the judgment.

Plaintiff does not cite any authorities, and we know of none supporting his contention. This court does not seem to have passed on the question.

Section 5967, Comp. Stat. 1921, provides as follows:

"As a general rule, compensation is the relief or remedy provided by the law of this state for the violation of private rights, and the means of securing their observance, and specific and preventive relief may be given in no other cases than those specified herein."

Section 5969 provides as follows:

"**Any person** who suffers detriment from the unlawful act or omission of another, may recover from the person in fault a compensation therefor in money, which is called damages."

Section 5970 defines detriment:

"Detriment is a loss or harm suffered in person or property."

Now let us see what Eggers and Nottage did to damage the defendant Olsons. Nottage took a deed from Yates to an undivided half interest in the land, and although notified to do so, refused to clear the title by deeding it to the Olsons. Nottage deeded the half interest to his son-in-law, Eggers, and the Olsons had to employ legal counsel and go to the expense and give time to bring an action to clear the title. The action sounds in tort and is of equitable recognizance and after giving notice to the offending parties to clear the title, and under these facts and circumstance, it would appear that whatever the expenses of the action, including attorneys fees, would be detriment suffered by reason of the unlawful acts or omissions of others, as defined by the sections of the statute above quoted. The Olsons asked that the Nottages be made parties to the action, as they were in the chain of title in controversy, and the court ordered them made parties and they appeared and pleaded, and in this the court was right.

Crow v. Hardridge, 43 Okla. 463, 143 Pac. 183; Boyd v. Robinson, 47 Okla. 591, 149 Pac. 1146; Florida Land Rock Phosphate Company v. Anderson (Fla.) 39 South. 392, Fraser v. Passage (Mich.) 30 N. W. 334; Donovan v. Champion, 85 Fed. 71; S. Blum & Company v. Wyly, 36 South. 202; Larson v. Allen (Wash.) 74 Pac. 1069.

The Olsons. in their cross-petition, stated their items of damages as $4.25 for trip to McAlester, $1 for copies of deed, and $1.50 for service of notice on D. Nottage and wife, and $1 for service of notice on Eggers, and $250 for attorneys fees in defense of action, and $15 probable expenses of Mrs. Olson in attending court. The last two items were stricken by the court, leaving the amount of actual damages of $7.75.

We think the court was correct in refusing to sustain the motion to strike the bill of items. The act of the court striking the two items is not before us for consideration. We think the sections of the statutes above quoted are sufficient authority upon which to base the action for actual damages, and, section 5975, Comp. Stat. 1921, provides for exemplary damages as follows:

"In any action for the breach of an obligation not arising from contract where the defendant has been guilty of oppression, fraud or malice, actual or presumed the jury in addition to the actual damages may give damages for the sake of example and by way of punishing the defendant."

Punitive damages cannot be had unless there is first actual damages, and oppression, fraud, or malice, actual or presumed, on the part of offending party. In the case at bar the first requirement is satisfied by the items constituting the $7.75, and the second requirement is satisfied by the defendant Nottage taking a deed from Yates when he knew or could have known that Yates had no title to convey, and by the plaintiff and Nottage acting together in executing the deed from Nottage to Eggers, and by both parties refusing to clear the title upon demand and notice of the Olsons. The great weight of authority sustains the action for damages under the facts and circumstances disclosed by this record. 8 R. C. L. p. 499, section 60; Nelson v. Kellogg (Cal.) 123 Pac. 1015; Inhabitants of Westfield v. Mayo, 23 Am. Rep. 292, 122 Mass. 100; Lawrence v. Hagerman, 8 A. R. 674, 56 Ill. 68; Philpot v. Taylor, 20 A. R. 241, 75 Ill. 309; Andrews v. Davison, 43 A. D. 606, 17 N. H. 413; Collins v. Whitehead, 34 Fed. 121; Chesbro v. Powers (Mich.) 44 N. W. 290; Finney v. Smith (Ohio) 27 A. R. 524.

We have read with great interest the well prepared and astute briefs of counsel for both parties and examined the very voluminous record in the case, and we think the trial was fairly conducted and substantial justice was done toward all parties, and we, therefore, recommend that the judgment of the trial court be affirmed.

By the Court: It is so ordered.